**Redacted Version**

No. 16-1549C
(Senior Judge Bruggink)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

---

ECOSYSTEM INVESTMENT PARTNERS,
Plaintiff,

v.

THE UNITED STATES,
Defendant,

and

CROSBY DREDGING, LLC,
Defendant-Intervenor.

---

# DEFENDANT'S MOTION TO DISMISS

---

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

MARTIN F. HOCKEY, JR.
Assistant Director

GEOFFREY M. LONG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Telephone: (202) 307-0159
Fax: (202) 309-0972

December 9, 2016

Attorneys for Defendant

TABLE OF CONTENTS


QUESTIONS PRESENTED....4

STATEMENT OF THE CASE....5

I. Nature Of The Case....5

II. Statement Of Facts....5

A. The Hurricane and Storm Damage Risk Reduction System And Resulting Mitigation Requirements....5

B. The Solicitation....11

C. EIP And Chef Menteur Bank....13

D. The GAO Dismisses EIP's Protest As Untimely, And The Contract Is Awarded....18

ARGUMENT....19

I. Standards Of Review....19

A. Motions To Dismiss Pursuant To RCFC 12(b)(1)....19

B. Motions To Dismiss Pursuant To RCFC 12(b)(6)....19

II. The Corps' Determination Of Appropriate Compensatory Mitigation Was Not Made In Connection With A Procurement....20

III. This Court Has No Jurisdiction Over EIP's Claims For Declaratory Judgment....24

IV. EIP Lacks Standing Because It Is Not A Prospective Bidder....24

V. EIP Has Waived Its Claims By Failing To Protest Prior To Bid Opening....28

VI. EIP States No Claim For A Violation Of 33 C.F.R. § 332.3(b)....31

CONCLUSION....33

# TABLE OF AUTHORITIES

Cases

*Am. Airlines, Inc. v. United States,*
551 F.3d 1294 (Fed. Cir. 2008) ........ 29

*Am. Airlines, Inc. v. United States,*
77 Fed. Cl. 672 (2007) ........ 29

*Am. Fed'n of Gov't Emps. v. United States,*
258 F.3d 1294 (Fed. Cir. 2001) ........ 25

*Arcata Associates, Inc. v. United States,*
110 Fed. Cl. 290 (2013) ........ 25

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........ 20

*Bannum, Inc. v. United States,*
115 Fed. Cl. 148 (2014) ........ 25

*Bannum, Inc. v. United States,*
779 F.3d 1376 (Fed. Cir. 2015) ........ *passim*

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........ 20

*Blazavich v. United States,*
29 Fed. Cl. 371 (1993) ........ 19

*Blue & Gold Fleet, L.P. v. United States,*
492 F.3d 1308 (Fed. Cir. 2007) ........ 29, 30

*Brookhart v. Janis,*
384 U.S. 1 (1966) ........ 29

*CGI Fed., Inc. v. United States,*
779 F.3d 1346 (Fed. Cir. 2015) ........ 25, 26

*Client Network Servs. Inc. v. United States,*
64 Fed. Cl. 784 (2005) ........ 20

*Digitalis Educ. Sols., Inc. v. United States,*
664 F.3d 1380 (Fed. Cir. 2012) ........ 25, 28

*Distributed Sols., Inc. v. United States,*
539 F.3d 1340 (Fed. Cir. 2008) ........ 21

Table of Authorities - continued

Cases - continued

*Hall v. United States*,
74 Fed. Cl. 391 (2006) .......... 19

*Henke v. United States*,
60 F.3d 795 (Fed. Cir. 1995) .......... 19

*Idaho Rivers United v. United States Army Corps of Engineers*,
2016 WL 498911 (W.D. Wa. Feb. 9, 2016) .......... 33

*Johnson v. Zerbst*,
304 U.S. 458 (1938) .......... 28

*Knight v. United States*,
52 Fed. Cl. 243 (2002), .......... 19

*Knight v. United States*,
65 Fed. App'x 286 (Fed. Cir. 2003) .......... 19

*LABAT-Anderson, Inc. v. United States*,
65 Fed. Cl. 570 (2005) .......... 21, 22, 24

*Maniere v. United States*,
31 Fed. Cl. 410 (1994) .......... 19

*Maryland Citizens for a Representative Gen. Assembly v. Governor of Maryland*,
429 F.2d 606 (4th Cir. 1970) .......... 24

*MCI Telecomms. Corp. v. United States*,
878 F.2d 362 (Fed. Cir. 1989) .......... 25

*Myers Investigative & Sec. Servs., Inc. v. United States*,
275 F.3d 1366 (Fed. Cir. 2002) .......... 25

*New Jersey v. United States Army Corps of Engineers*,
2011 WL 115878 (D.N.J. Jan 13, 2011) .......... 33

*O. Ahlborg & Sons, Inc. v. United States*,
74 Fed. Cl. 178 (2006) .......... 19

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) .......... 24

*Phoenix Mgmt., Inc. v. United States*,
125 Fed. Cl. 170 (2016) .......... 31

Table of Authorities - continued

Cases - continued

*RAMCOR Servs. Grp., Inc. v. United States*,
185 F.3d 1286 (Fed. Cir. 1999)........................................................................ 21, 22

*Reynolds v. Army and Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988)........................................................................ 19

*Rogers v. United States*,
95 Fed. Cl. 513 (2010) ........................................................................................ 19

*Seaboard Lumber Co. v. United States*,
903 F.2d 1560 (Fed. Cir. 1990)........................................................................ 29

Statutes

Administrative Dispute Resolution Act of 1996,
Pub. Law No. 104–320, § 12, 110 Stat. 3870, 3874 ........................................ 30

National Defense Authorization Act for Fiscal Year 2004,
Pub. Law No. 108-136, § 314(b), 117 Stat. 1392, 1431 .................................... 32

National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ................................ 2

10 U.S.C. § 2305(a)(1)........................................................................... 5, 21, 24

10 U.S.C. § 2462............................................................................................ 22

28 U.S.C. § 1491(b)(1) .............................................................................. *passim*

28 U.S.C. § 1491(b)(2) ....................................................................................... 24

28 U.S.C. § 1491(b)(3) ....................................................................................... 30

31 U.S.C. § 3553(c)(2)........................................................................................ 22

33 U.S.C. § 1344............................................................................................ 4, 5, 32

33 U.S.C. § 2283.................................................................................................. 6

33 U.S.C. § 2317b....................................................................................... 5, 21, 24, 32

33 U.S.C. § 401............................................................................................. 4, 32

33 U.S.C. § 403............................................................................................. 4, 32

41 U.S.C. § 111................................................................................................ 21

Table of Authorities - continued

Statutes - continued

42 U.S.C. § 4321 .......... 2

Regulations

Final Rule on Compensatory Mitigation for Losses of Aquatic Resources,
73 Fed. Reg. 19,594, (April 10, 2008) .......... 32

4 C.F.R. § 21.2(a)(1) .......... 18

32 C.F.R. Part 169.1 .......... 22

32 C.F.R. Part 169a.1 .......... 22

33 C.F.R. Part 332 .......... 13, 33

33 C.F.R. § 320.2(f) .......... 5

33 C.F.R. § 332.1 .......... 32

33 C.F.R. § 332.1(a)(1) .......... 32

33 C.F.R. § 332.2 .......... 8

33 C.F.R. § 332.3 .......... 4, 33

33 C.F.R. § 332.3(b) .......... *passim*

33 C.F.R. § 336.1 .......... 33

40 C.F.R. § 230.91 .......... 32

FAR § 33.103(d)(2) .......... 27

FAR § 33.103(d)(3) .......... 26

FAR § 52.233-2 .......... 12, 26

Rules

Fed. R. Civ. P. 8(a)(2) .......... 20

RCFC 12(b)(1) .......... 19

RCFC 12(b)(6) .......... 19

RCFC 12(h)(3) .......... 19

Table of Authorities - continued

Other Authorities

Executive Order 12,615, Performance of Commercial Activities (Nov. 19, 1987)
52 Fed. Reg. 44,853 .......... 22

Office of Management and Budget Circular A–76 (2003) .......... 22

**Redacted Version**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| ECOSYSTEM INVESTMENT PARTNERS, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 16-1549C |
| | ) | Senior Judge Bruggink |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| CROSBY DREDGING, LLC, | ) | |
| Defendant-Intervenor. | ) | |

DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the bid protest complaint of plaintiff, Ecosystem Investment Partners (EIP), for lack of jurisdiction or, in the alternative, partially dismiss the complaint for failure to state a claim.

EIP purchased the Chef Menteur Mitigation Bank in 2013. A mitigation bank is an aquatic resource area that has been restored, established, enhanced, or preserved. The bank may then sell "credits" to entities required to compensate for environmental impacts. Since purchasing the bank, EIP has lobbied the United States Army Corps of Engineers (Corps) on multiple occasions to find that the bank's credits should be used as compensatory mitigation for certain brackish marsh wetland impacts caused by the Corps' construction of the Hurricane and Storm Damage Risk Reduction System (HSDRRS) in the New Orleans area. The Corps purchased other mitigation banks' credits for some HSDRRS habitat impacts, but it determined

that for brackish marsh habitat impacts, the most suitable compensatory mitigation would be a Corps-constructed marsh restoration project, to take place in part at "New Zydeco Ridge" in the Big Branch National Wildlife Refuge. The brackish marsh restoration was to take place on a national wildlife refuge because many of the HSDRRS brackish marsh impacts were on national wildlife refuges, and the United States Fish and Wildlife Service has a policy that where impacts are on-refuge, mitigation must also be on-refuge.

The Corps' determination to conduct mitigation in part at New Zydeco Ridge was finalized in a National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*, environmental report that was signed on October 20, 2015. EIP failed to comment on the report during the summer of 2014 public comment period, but in 2016 it has strenuously opposed the Corps' determinations; it has lobbied at the Corps' national, division, and district levels for the Corps to abandon its decision that the New Zydeco Ridge marsh restoration would compensate for 23.7 "AAHUs" of off-refuge impacts. ("AAHUs" serve in this case to value the environmental impacts of compensatory mitigation, as we explain further below.)

After the Corps completed its mitigation plan, the Corps' Engineering Division requested that its Procurement Division solicit dredging and other construction services for purposes of wetland restoration. EIP did not submit a bid in response to the resulting solicitation – it is not a provider of dredging services – but it did continue to object to the Corps' mitigation plan. The solicitation for dredging and other construction services was set to close on August 4, 2016. On August 3, 3016, EIP sent a letter to the Corps' New Orleans District Commander and others – but not to the contracting officer, who was identified in the solicitation as the individual to receive agency-level bid protests. (The Federal Acquisition Regulations (FAR) require that agency-level protests be filed with the contracting officer.) EIP again objected to the Corps'

plan, but it did not describe its letter as a protest, and in addition to being misaddressed and not described as a protest, the letter does not meet all of the formal requirements of a bid protest. Bid opening proceeded as scheduled on August 4, 2016.

The Court should reject EIP's argument that the Corps' development of its mitigation plan for HSDRRS impacts was "in connection with a procurement," within the scope of 28 U.S.C. § 1491(b)(1). While the definition of "procurement" is broad, it would stretch this Court's jurisdiction beyond recognition to allow disappointed providers of mitigation credits to protest a mitigation plan that was initiated well before, and independently of, any procurement process, for purposes of ensuring compliance with environmental statutes, rather than with procurement laws and regulations.

In the alternative, this Court has no jurisdiction over EIP's declaratory judgment claims in Counts I and II, because any opinion would be purely advisory. EIP also cannot establish standing, because by failing to lodge a timely protest, it has removed itself from the category of prospective bidders, and it therefore is not an "interested party." In its complaint, EIP suggests that its August 3, 2016 letter to the Corps met the requirement of a formal agency-level protest, but a review of the letter and the surrounding circumstances belie that argument. And, in any event, EIP has waived its claims, because the Federal Circuit has held that where a protestor objects to the terms of a solicitation, it must file a formal protest prior to the close of the bidding process. *Bannum, Inc. v. United States,* 779 F.3d 1376 (Fed. Cir. 2015). It is not sufficient for EIP to demonstrate that the Corps was on notice of EIP's objections – there must be a formal protest. Because there was no formal protest before bid opening, EIP has waived its right to protest, and the Court's consideration of this matter should end there.

Finally, EIP has failed to state a claim with respect to the portion of Count I of its complaint that relies upon 33 C.F.R. § 332.3. That regulation applies only to permits issued by the Corps to parties pursuant to section 404 of the Clean Water Act (33 U.S.C. § 1344) and/or sections 9 or 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. §§ 401, 403). It does not create any enforceable obligations with respect to the Corps' selection of mitigation to compensate for its own activities.

## QUESTIONS PRESENTED

1. Whether alleged violations of statutes and regulations by the Corps, in the course of evaluating potential compensatory mitigation, were "in connection with" the Corps' subsequent procurement of dredging and construction services, such that the Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1491(b)(1).

2. Whether this Court has jurisdiction over EIP's claims for declaratory judgment.

3. Whether EIP is an "interested party" to the challenged solicitation, and therefore has standing pursuant to section 1491(b)(1), where it neither submitted a bid nor filed a protest prior to bid opening.

4. Whether EIP waived its claims by not filing a formal protest in any forum prior to bid opening, despite knowing of the grounds for its protest long before the solicitation opened.

5. To the extent the Court finds subject matter jurisdiction, whether EIP has stated a claim for violations of 33 C.F.R. § 332.3(b), which applies only to permits issued by the Corps pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1344, and/or sections 9 or 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401, 403.

## STATEMENT OF THE CASE

### I. Nature Of The Case

EIP seeks declaratory judgment and preliminary and permanent injunctions in relation to the award and performance of a contract under Solicitation Number W912P8-16-B-0027. Compl. ¶ 4, ECF No. 1. EIP pleads three counts. In Count I, EIP seeks a declaration that the Corps violated 33 C.F.R. § 332.3(b) and 33 U.S.C. § 2317b, which EIP contends establish a preference for mitigation banks when the Corps determines appropriate compensatory mitigation for its own projects. *See* Compl. ¶¶ 52-58.[1]

In Count II, EIP seeks a declaration that the Corps violated the requirements of the Competition in Contracting Act (CICA), 10 U.S.C. § 2305(a)(1). *See* Compl. ¶¶ 59-66. EIP alleges that the Corps improperly "bundled" its mitigation requirements in a manner that excluded EIP's mitigation bank and other mitigation banks from consideration. *See* Compl. ¶ 4. In Count III, EIP seeks preliminary and permanent injunctions prohibiting the Corps from proceeding with award and performance of the contract. *See* Compl. ¶¶ 67-71.

### II. Statement Of Facts

#### A. The Hurricane and Storm Damage Risk Reduction System And Resulting Mitigation Requirements

1. As a result of the devastation caused by Hurricanes Katrina and Rita in 2005, the Corps was tasked to construct the system of levees, floodwalls, and other flood risk reduction features surrounding the New Orleans metropolitan area known as the Hurricane and Storm

[1] This is as opposed to situations where a private party seeks a permit from the Corps to impact jurisdictional waters, pursuant to Section 404 of the Clean Water Act, and the Corps, as part of its regulatory function, decides whether the permittee has proposed acceptable compensatory mitigation for those impacts. *See generally* 33 U.S.C. § 1344; 33 C.F.R. § 320.2(f).

Damage Risk Reduction System. Tab 11, AR 445.[2] The $14.5 billion HSDRRS is designed to provide 100-year level risk reduction for the greater New Orleans area (meaning it provides flood risk reduction for a 100-year storm). Tab 11, AR 445.

2. During the construction of the system, wetland habitats were damaged or destroyed. Tab 11, AR 445. The Corps is required to mitigate for those impacts by replacing the destroyed habitats with the same types and amounts of habitat elsewhere. 33 U.S.C. § 2283. The Corps is currently planning, designing and implementing mitigation projects to replace the impacted habitats, an ongoing effort that began in earnest in 2010. Tab 11, AR 445.

3. The Corps' mitigation plan was initially detailed in "Programmatic Individual Environmental Report #36: Lake Pontchartrain And Vicinity [(LPV)] Hurricane And Storm Damage Risk Reduction System Mitigation" (PIER #36). Tab 20, AR 1157-1505. The decision record for PIER #36 was signed on November 22, 2013. The actions described in PIER #36 were to "compensate for habitat losses incurred during construction of the LPV HSDRRS to six specific types of habitat: fresh marsh, intermediate marsh, brackish marsh, swamp, BLH-Dry and BLH-Wet." Tab 20, AR 1194.

4. A "habitat-based methodology" in the form of a wetland value assessment (WVA) model was used to assess impacts from construction of the HSDRRS work and also to assess future benefits to be obtained through the compensatory mitigation projects. Tab 20, AR 1198. "The WVA model computes the difference in the habitat value over the period of

---

[2] "Tab __, AR __" refers to the administrative record in this matter, which the Government filed on November 30, 2016. ECF No. 14.

analysis between the future with and future without project conditions." Tab 20, AR 1198. The difference is expressed as net average annual habitat units (AAHUs). Tab 20, AR 1198.[3]

5. The mitigation plan described in PIER #36 addressed a total of 508.53 AAHUs of impacts, including 8.79 AAHUs of brackish marsh impacts located on United States Fish and Wildlife Service (FWS) wildlife refuges and 118.06 AAHUs of "non-refuge" brackish marsh impacts. Tab 20, AR 1157.

6. Impacted habitats were grouped according to whether or not the impact occurred on refuge property (specifically, Bayou Sauvage National Wildlife Refuge (BSNWR)) or non-refuge property, because any impacts that occurred on refuge property were to be mitigated for on refuge property, as a matter of Department of Interior policy. Tab 23, AR 1621.

7. The analysis of mitigation options in PIER #36 was based upon screening criteria established by the Corps. Tab 38a, AR 2243-2266. One of the screening criteria was that a measure must meet 100 percent of mitigation requirements by habitat type. Tab 38a, AR 2262. This requirement was designed to "work toward identifying projects that will result in large contiguous tracts of land for the purposes of greater ecological output within the watershed. In addition, the consolidation of mitigation projects produces cost efficiencies experienced during construction and O&M phases." Tab 38a, AR 2264. This statement was consistent with a letter dated March 19, 2010 – referenced in the screening criteria – in which the Assistant Secretary of the Army stated to the Governor of Louisiana that the Army was "committed to identifying large-scale projects that will mitigate for the impacts caused by the HSDRRS program and provide the most effective benefits to coastal and ecosystem restoration." Tab 38d, AR 2274.

---

[3] "For example, if the net change between the future without project condition (FWOP) and future with project (FWP) over the 50-year period of evaluation is a +0.2 over 100 acres, then that project would produce 20 AAHUs of ecological benefit." Tab 20, AR 1198.

8. The decision record for PIER #36 explained that the mitigation plan was divided into constructible and programmatic features. The constructible features were recommended for implementation, and included the purchase from mitigation banks of 93.85 AAHUs of "Non-Refuge Bottomland Hardwood (BLH) -Wet/Dry" and 108.01 credits of "Non-Refuge Swamp," for a total purchase from mitigation banks of 201.86 AAHUs. *See* Tab 20, AR 1158.

9. A mitigation bank is a wetland, stream, or other aquatic resource area that has been restored, established, enhanced, or, in certain circumstances, preserved. 33 C.F.R. § 332.2. Units of the restored, established, enhanced, or preserved resources may be purchased as "credits" by permittees from the banks to meet their requirements for compensatory mitigation. *See id.* In May 2014, the Corps contracted to purchase the above-referenced credits from mitigation banks. *See* Tab 38b, AR 2267-68; Tab 38c, AR 2270-72.

10. In addition to the recommended purchase of mitigation bank credits as constructible features of the mitigation plan for BLH Wet/Dry and swamp impacts, in PIER #36 the Corps also recommended for further evaluation and design four programmatic features of the mitigation plan, including the "Bayou Sauvage Marsh Restoration." Tab 20, AR 1158. That proposed brackish marsh restoration/enhancement project "would provide the required 118.06 AAHUs of general impacts and 8.79 AAHUs of refuge impacts totaling 126.85 AAHUs." Tab 20, AR 1160.

11. On October 20, 2015, the Corps supplemented PIER #36 with the "Individual Environmental Report Prepared to Supplement: Programmatic Individual Environmental Report (PIER) 36 Bayou Sauvage, Turtle Bayou & New Zydeco Ridge Restoration Project Saint Tammany & Orleans Parishes, Louisiana PIER 36, Supplement 1" (SIER 1). Tab 24, AR 1910-1974. The draft of SIER 1 had been distributed for a 30-day public review and

comment period on July 9, 2014 and the comment period had closed on August 8, 2014. Tab 24, AR 1963.[4]

12. SIER 1 was prepared in order to evaluate mitigation projects to compensate for refuge impacts to bottomland hardwood forests and brackish marsh impacts, as well as non-refuge impacts to brackish marsh. Tab 24, AR 1910. Most importantly for purposes of this litigation, SIER 1 established a mitigation plan for the above-referenced 8.79 AAHUs of brackish marsh impacts located on FWS wildlife refuges and 118.06 AAHUs of non-refuge brackish marsh impacts. Tab 20, AR 1910. (A map of the mitigation projects addressed in SIER 1 is located at page 1927 of the administrative record.)

13. As explained in SIER 1, the Corps determined that the previously-considered Bayou Sauvage brackish marsh restoration was infeasible. Tab 24, AR 1922. The Corps therefore relocated the proposed restoration, within the same area. Tab 24, AR 1924. The refined proposal would result in the creation of approximately 103.2 AAHUs of brackish marsh within the BSNWR. Tab 24, AR 1911. That left an anticipated outstanding balance of 23.7 AAHUs of brackish marsh mitigation that could not be accomplished in that refuge. Tab 24, AR 1911.

14. In addition to relocating the Bayou Sauvage mitigation, SIER 1 also addressed challenges that had arisen with respect to mitigation for Bottomland Hardwood – Wet (BLH-Wet) impacts. The solution proposed by the Corps was to perform mitigation for those impacts at New Zydeco Ridge, within the Big Branch National Wildlife Refuge (BBNWR). Tab 24,

---

[4] The time between the close of the public comment period and the finalization of SIER 1 on October 20, 2015 was needed to complete consultations between the Corps and FWS related to the Endangered Species Act. Tab 11, AR 448. That formal consultation commenced on July 11, 2014 and concluded on August 19, 2015. Tab 11, AR 448-49.

AR 1924, AR 1933. Accomplishing that mitigation, however, would itself impact shallow open water emergent fish habitat within BBNWR. Tab 24, AR 1935. To compensate for those refuge impacts, the Corps proposed to create 21.2 AAHUs of emergent intermediate/brackish marsh habitat at New Zydeco Ridge. Tab 24, AR 1935.

15. To additionally address the outstanding balance of 23.7 AAHUs of brackish marsh impact that could not be mitigated by the Bayou Sauvage project, as described above, and to address some other impacts not relevant here, the Corps decided to create approximately 82.3 acres of brackish marsh at the New Zydeco Ridge Brackish Marsh project, adjacent to the BLH-Wet mitigation. Tab 24, AR 1935.

16. The Corps in SIER I considered the use of mitigation banks, noting that "[f]ollowing guidelines established in the Water Resources Development Act (WRDA) of 2007 Section 2036(c)(1) in carrying out a water resources project involving wetlands mitigation and impacts that occur within the service area of a mitigation bank, USACE, where appropriate, would first consider the use of the mitigation bank if the bank contains sufficient available credits to offset the impact and the bank is approved in accordance with the Federal guidance for the establishment, use, and operation of mitigation banks." Tab 24, AR 1938. The Corps further noted, however, that mitigation bank credits could not be used to compensate for refuge impacts, due to USFWS policy requiring that Refuge habitat impacts be mitigated on refuge property. Tab 24, AR 1938-39.[5]

[5] FWS issued a special use permit for the New Zydeco Ridge work on March 18, 2016. Tab 27, AR 2047-50. On November 8, 2016, FWS's Regional Director granted an internal policy exception to allow the Corps to mitigate for off-refuge impacts at New Zydeco Ridge, within BBNWR. Tab 90, AR 2251-61.

17. The Corps concluded that "[i]f the [Corps] is unable to implement the expansion of the New Zydeco Ridge marsh project to account for brackish marsh impacts that cannot be mitigated at the Bayou Sauvage Flood Side Brackish Marsh restoration project (23.7 AAHUs), then the purchase of mitigation bank or ILF credits would be an option the USACE may pursue to complete the mitigation of the LPV HSDRRS general brackish marsh impacts." Tab 24, AR 1939.

18. The Corps' decision to use a Corps-constructed mitigation project at New Zydeco Ridge was affirmed when the Project Description Document was approved by Major General Michael C. Wehr on November 19, 2015, and the Corps began its acquisition process. Tab 34, AR 2137.

B. The Solicitation

19. On April 12, 2016, the Acting Chief of the Engineering Division for the Corps of Engineers Mississippi Valley New Orleans requested that the Contracting Division issue a pre-solicitation notice for the New Zydeco Ridge Flood Side Bottom Land Hardwood-Wet (BLH-Wet) and Brackish Marsh Restoration. Tab 33, AR 2134-35. The Acting Chief included, among other things, a description of the work to be provided, a commitment that the Engineering Division would provide electronic files to the Contracting Division by a date certain, and a further request that the Contracting Division check specifications for compliance with procurement regulations and prepare the specifications for advertising. Tab 33, AR 2134.

20. On April 28, 2016, the Agency issued a pre-solicitation notice for Solicitation No. W912P8-16-B-0027. Tab 28, AR 2051-52. On May 13, 2016, the Agency issued an invitation for bid. Tab 16a, AR 883-1125. The solicitation was issued as an unrestricted procurement (no set aside), size standard $36.5M, NAICS 237990 (Other Heavy and Civil Engineering Construction). Tab 12, AR 449.

21. The scope of the work solicited was summarized as follows:

> The work consists of wetland restoration in existing shallow open water via borrow dredging from a designated borrow pit within Lake Pontchartrain. Both BLH-W and marsh platforms will be constructed. The work requires retention dike construction, board road placement, and a jack-and-bore effort to provide the dredge disposal pipeline access to the construction site.

Tab 16a, AR 885.

22. The solicitation incorporated by full text FAR § 52.233-2, "Service of Protest (Sep 2006)," as follows:

> (a) Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the Government Accountability Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from
>
> **U.S. Army Corps of Engineers, New Orleans District**
> **Attn: Charles Zammit, Jr.**
> **CEMVN-CT-W, Room 184**
> **7400 Leake Avenue**
> **New Orleans, LA 70118-3651**

Tab 16a, AR 893 (emphasis original).

23. Questions from contractors regarding the solicitation were due May 24, 2016, and bid opening was set for June 14, 2016, 2:00 pm, CST. Tab 16a, AR 885, AR 887.

24. On June 9, 2016, the Corps issued Amendment No. 0001 to the solicitation to incorporate contractor-submitted questions, agency responses, and associated specification changes, as well as to extend the bid opening date until June 23, 2016, 2:00 pm, CST. Tab 16b, AR 1126.

25. On June 21, 2016, the Agency issued Amendment No. 0002 to the Solicitation to postpone the bid opening date indefinitely. Tab 16c, AR 1140. On July 29, 2016, the Agency issued Amendment No. 0003 to the Solicitation via the FedBizOpps website to revise the time

for contract performance, revise Section 01100 of the solicitation, and to establish the bid opening date of August 4, 2016, 2:00 pm, CST. Tab 16d, AR 1141.

26. On August 4, 2016, six timely bids were received and the bid opening was conducted. EIP did not submit a bid. On August 5, 2016, the bid abstract was posted to FedBizOpps. Tab 30, AR 2056-58. The lowest bidder was Crosby Dredging, LLC. Tab 29, AR 2056. The contract was awarded to Crosby Dredging on November 18, 2016. Tab 91, AR 2562.

C. EIP And Chef Menteur Bank

27. EIP purchased the Chef Menteur Bank in February 2013. Compl. ¶ 27. The bank is regulated by the Corps' Regulatory Division and is approved by the Corps to sell brackish marsh mitigation credits, in accordance with its mitigation banking instrument (MBI) and the Corps' regulations at 33 C.F.R. Part 332. Tab 11, AR 446.

28. As the regulating agency, the Corps maintains information about the bank and enforces the bank's compliance with its obligations under its MBI. Tab 11, AR 446. The Corps also approves releases of credits to the Bank contingent on the Bank's compliance with its MBI and its achievement of specified success criteria for its constructed habitat. Tab 11, AR 446. Credits released to the Bank may be sold to satisfy developers' wetland mitigation requirements. Tab 11, AR 446.

29. Prior to April 13, 2015, the Chef Menteur Bank never had more than 16 credits available for sale, except from January 17, 2014 through March 21, 2014. Tab 18, AR 1149-54. For example, when public comment for SIER 1 closed on August 8, 2014, the bank had a balance of 15.21 credits to sell. *See* Tab 18, AR 1150, AR 1153 (as indicated by Line 42 of the spreadsheet that constitutes Tab 18; the line begins on AR 1150, and continues on AR 1153, due

to print formatting). Using the conversion rate used by EIP in its complaint, Compl. at 7 n.1, this equates to 3.02 AAHUs.

30. EIP has had "many" direct discussions with the Corps regarding the Chef Menteur Bank. Tab 7, AR 408. On March 12, 2013 – prior to the issuance of PIER #36 for public comment – Nicholas Dilks of EIP wrote to Sohelia Holley of the Corps' New Orleans District. Tab 6, AR 341-42. Mr. Dilks raised questions about the District's "compliance with the intent under WRDA to prioritize the use of mitigation banks" for wetland impacts related to the HSDRRS. Tab 6, AR 341-42.

31. On April 3, 2013, Col. Edward Fleming, the Corps' District Commander, responded to Mr. Dilks' letter. Tab 6, AR 343-44. Col. Fleming addressed an issue that Mr. Dilks had raised: whether the Corps would only accept mitigation bank credits as compensatory mitigation for HSDRRS impacts if a single bank could provide 100 percent of credits for a given habitat type. Tab 6, AR 343. Col. Clancy explained that the Corps had determined that "if the Corps chooses to satisfy its mitigation obligation through the purchase of bank credits, and if appropriate and cost-effective, the Corps may purchase mitigation bank credits from more than one bank to fulfill the compensatory mitigation requirements for a particular habitat type." Tab 6, AR 343.

32. Col. Clancy continued: "As discussed during our meeting with you on January 23, 2013, the Corps is not considering fulfilling the mitigation requirements with a combination of mitigation bank credits and Corps-constructed projects for the same habitat type." Tab 6, AR 344. Col. Clancy also stated that "[a]t this time, it is anticipated that Corps-constructed projects will be the preferred alternatives to compensate for losses to . . . habitat types" other than non-refuge swamp and non-refuge bottomland hardwood forest. Tab 6, AR 343. A project

manager for the Corps made similar indications in an April 24, 2013 e-mail to Mr. Dilks, which followed an April 10, 2013 meeting between EIP and the Corps. Tab 38e, AR 2276-2278.2.

33. On July 26, 2013, the Chief of the Regulatory Branch for the Corps' New Orleans District sent a letter to EIP. Tab 19, AR 1155-56. He stated that the Corps would not release additional credits for "Phase I" of Chef Menteur Bank, due to a failure to meet initial success criteria, and that a previous release of Phase II credits would be removed from the bank's ledger pending the beginning of delayed "Phase II" construction. Tab 19, AR 1155.

34. On September 18, 2013, EIP commented on the draft PIER #36. Tab 21, AR 1519-24. Among the comments is a recommendation by EIP that the Corps "acknowledge the presence of the Chef Menteur Pass Mitigation Bank as a source of brackish marsh mitigation available for HSDRRS use either as the preferred alternative (subject to credit availability and price at time of solicitation) or at least as a source of alternative mitigation if the Corps-constructed alternatives prove to be unfeasible or overly expensive." Tab 21, AR 1520. The Corps' responses to EIP's comments are recorded in the comment response matrix attached as an appendix to the final PIER #36. Tab 21, AR 1509-10.

35. Although EIP commented on the draft PIER #36, it did not submit comments on the subsequent draft SIER 1 during the 30-day public review and comment period that opened on July 9, 2014 and closed Aug 8, 2014. Tab 24, AR 1963; Tab 11, AR 448.

36. On January 16, 2016, EIP filed a Freedom of Information Act request for documents used in the calculation and assessment of habitat values to be gained through the construction of the mitigation projects evaluated in SIER 1. Tab 11, AR 449. The Corps responded with the requested documents on February 16, 2016. Tab 11, AR 449.

37. On May 18, 2016, Adam Davis of EIP wrote to Lowry Crook, Principal Deputy Assistant Secretary of the Army (Civil Works), to follow up on a May 3rd meeting. Tab 1b, AR 268. Mr. Davis stated in his 21-page letter that "the scoring methods used to determine the number of credits that are available from the [bank] do not accurately compare this private option with the actual cost and delivery risk of Corps-constructed projects being proposed by the New Orleans District." Tab 1b, AR 268.

38. On May 20, 2016, EIP again wrote to Lowry Crook. Tab 6, AR 381. On the same date, it also wrote to Maj. Gen. Michael Wehr, Commanding General of the Corps' Mississippi Valley Division, and to Steve Stockton, Director of Civil Works for the Corps, regarding HSDRRS mitigation. Tab 6, AR 383-87.

39. On June 16, 2016, Mr. Davis of EIP wrote to Col. Richard L. Hansen, Commander of the Corps' New Orleans District. Tab 1b, AR 290-91. The letter was a follow-up to a June 8th meeting. Tab 1b, AR 290.[6] Mr. Davis expressed interest in "resolv[ing] the scoring disparity removing the District's concern over the long term performance/longevity of the Chef Bank and other issues, resulting in the Chef Bank being viewed by the District as a viable option for District Civil Works mitigation." Tab 1b, AR 290. Mr. Davis stated that that "the District's Request for Bids to construct the HSDRRS Lake Pontchartrain New Zydeco Ridge (NZR) Corps Constructible Mitigation Site on the Bayou Sauvage U.S. Fish and Wildlife Refuge are due today with bid opening scheduled for June 23rd." Tab 1b, AR 290. Mr. Davis

---

[6] Col. Hansen described this meeting in a declaration submitted by the Corps at the GAO. Tab 35, AR 2139-41. Col. Hansen explained that the purpose of the meeting "was to listen to a presentation provided by EIP's environmental consultant regarding the Wetland Value Assessment (WVA) scoring of the Chef Menteur Bank . . . ." Tab 35, AR 2140.

"respectfully request[ed]" that the bank be permitted to compete for that mitigation. Tab 1b, AR 291.

40. Also on June 16, 2016, Nicholas Dilks of EIP also wrote to Col. Hansen. Tab 6, AR 389-93. In an attachment to that letter, EIP argued that the Corps had not first evaluated the availability of mitigation bank credits, as EIP alleged was required under "Section 2036(c)(1) of WRDA07." Tab 6, AR 391.

41. On August 3, 2016, Mr. Dilks of EIP wrote to Col. Michael Clancy, the new Commander of the Corps' New Orleans District. Tab 1b, AR 293-302. Mr. Dilks' letter was sent via e-mail addressed to Col. Clancy, with Mark Wingate and Troy Constance of the Corps copied.[7] Tab 6, AR 338-39.[8] Mr. Dilks wrote "to provide comments for the District's consideration on the subject Final Decision Record for [SIER 1] and planned Contract Award for the initial construction of New Zydeco Ridge (NZR) Flood Side BLH-Wet and Brackish Marsh Restoration for the LPV HSDRRS project." Tab 1b, AR 293.[9] (As noted above, the public comment period for SIER 1 had closed almost two years earlier, on August 8, 2014, without EIP submitting comments. Tab 24, AR 1963.)

42. In the August 3, 2016 letter, Mr. Dilks "respectfully request[ed]" that the Corps "[d]elay the award of the New Zydeco Ridge Flood Side BLH-Wet and Brackish Marsh Restoration contract, Code W912P8 ("NZR Bid") until the mitigation banking alternative for

[7] Mark Wingate is the Deputy District Engineer for Programs and Project Management, and Troy Constance is the Chief, Regional Planning and Environmental Division, South for the New Orleans District. Tab 7, AR 408.

[8] Mr. Dilks did not correctly address the e-mail to Col. Clancy, requiring Mr. Dilks to resend the e-mail to Col. Clancy at 4:44 p.m. on August 4, 2016. Tab 6, AR 338.

[9] Mr. Dilks incorrectly stated that "the bid opening date was to have occurred on June 23, 2016 . . . but has been indefinitely postponed as of the date of this letter." Tab 1b, AR 295.

brackish marsh non-Refuge impacts is conducted and completed." Tab 1b, AR 294. Mr. Dilks included with his letter "Technical Comments" that he claimed "elucidate what we believe to be the errors, omissions, and incorrect process . . . ." Tab 1b, AR 295. Mr. Dilks stated, incorrectly, that the bid opening for the solicitation had been indefinitely postponed. Tab 1b, AR 295. (In fact it was scheduled for the next day.) The word "protest" does not appear in EIP's letter. Tab 1b, AR 293-302.

D. The GAO Dismisses EIP's Protest As Untimely, And The Contract Is Awarded

43. On August 15, 2016, EIP filed a bid protest with the GAO. Compl. ¶ 47. On November 15, 2016, the GAO dismissed EIP's protest as untimely. Compl. ¶ 51; *see* Tab 89, AR 2547-50. The GAO noted that, under 4 C.F.R. § 21.2(a)(1), a protest raising alleged improprieties in a solicitation must be filed prior to bid opening. Tab 89, AR 2548. The GAO acknowledged that a protest to the GAO is timely if there has been a timely, agency-level protest that was rejected, and the GAO protest is filed within 10 days. Tab 89, AR 2548. But the GAO held that there was no agency protest, because EIP's August 3, 2016 letter to the Corps "was not intended to be a letter of protest and . . . it did not meet the solicitation's express requirements for filing an agency-level protest." Tab 89, AR 2550. Thus, the GAO concluded, because there had been no timely agency-level protest and EIP's protest to the GAO was filed 11 days after bid opening, the GAO protest was untimely. Tab 89, AR 2550.[10]

44. The subject contract was awarded to Crosby Dredging, LLC, on November 18, 2016. Tab 91, AR 2562. EIP filed this action on the same date.

[10] In *dicta*, the GAO also questioned its jurisdiction over the protest, even if it had been timely, noting that EIP's protest focused on the Corps' actions under NEPA, and the GAO's jurisdiction is limited to protests alleging a violation of a procurement statute or regulation. Tab 89, AR 2548 n.1 (citing 31 U.S.C. § 3552).

## ARGUMENT

I. Standards Of Review

A. Motions To Dismiss Pursuant To RCFC 12(b)(1)

When deciding a motion to dismiss under RCFC 12(b)(1), the Court "assume[s] all factual allegations [in the complaint] to be true and . . . draw[s] all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citations omitted); *see also Hall v. United States*, 74 Fed. Cl. 391, 393 (2006). However, if the moving party challenges the factual allegations concerning jurisdiction, the Court must resolve the allegations before turning to the merits. *See, e.g., Knight v. United States*, 52 Fed. Cl. 243, 246-47 (2002), *aff'd in part, rev'd in part on other grounds, and remanded*, 65 Fed. App'x 286 (Fed. Cir. 2003); *Maniere v. United States*, 31 Fed. Cl. 410, 413-15 (1994).

The Court is not required to accept the factual allegations in the complaint at face value. To the contrary, "[i]f the motion to dismiss is for lack of jurisdiction . . . and [the moving party] 'challenges the truth of the jurisdictional facts alleged in the complaint . . . the . . . court may consider relevant evidence in order to resolve the factual dispute.'" *Blazavich v. United States*, 29 Fed. Cl. 371, 373 (1993) (quoting *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988)). "Plaintiffs bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence before the Court proceeds to the merits of the action." *Rogers v. United States*, 95 Fed. Cl. 513, 515 (2010) (citation omitted); *see O. Ahlborg & Sons, Inc. v. United States*, 74 Fed. Cl. 178, 188 (2006). Ultimately, if the Court finds that it lacks subject matter jurisdiction over a claim, the Court must dismiss that claim. *See* RCFC 12(h)(3).

B. Motions To Dismiss Pursuant To RCFC 12(b)(6)

In order to resolve an RCFC 12(b)(6) motion to dismiss, the Court is required to accept the allegations in the complaint at face value. However, if the party opposing the motion is

unable to demonstrate that the complaint presents "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), the motion must be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that to avoid dismissal a complaint must "'state a claim to relief that is plausible on its face,'" quoting *Twombly*, 550 U.S. at 570); *see also Client Network Servs. Inc. v. United States*, 64 Fed. Cl. 784, 789 (2005) (granting a 12(b)(6) motion because "based on the facts alleged in the complaint" "the law countenances no remedy").

"[D]etermining whether a complaint states a plausible claim will . . . be a context-specific task . . . ." *Iqbal*, 556 U.S. at 679. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Unlike factual allegations, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action" are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## II. The Corps' Determination Of Appropriate Compensatory Mitigation Was Not Made In Connection With A Procurement

EIP invokes 28 U.S.C. § 1491(b)(1) in support of this Court's subject matter jurisdiction. Compl. ¶ 5. That statute states that the Court of Federal Claims shall have jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract *or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement*." 28 U.S.C § 1491(b)(1) (emphasis added).

EIP in its complaint and its motion for preliminary relief asserts that there has been a violation of a statute or regulation "in connection with a procurement," for purposes of 28 U.S.C.

§ 1491(b)(1). *See* Compl. ¶ 58 (alleging violations of 33 C.F.R. § 332.3(b) and 33 U.S.C. § 2317b); Compl. ¶ 66 (alleging violation of 10 U.S.C. § 2305(a)(1)); Pl. Memo. in Support of Mot. for Prelim. Relief at 8, ECF No. 4. EIP made a similar argument at the GAO, where it relied on 41 U.S.C. § 111, which defines "procurement" to include "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111. EIP places great emphasis on the words "all stages" and "beginning with the process for determining a need." *See* EIP's Comments on the Agency Report, Tab 37, AR 2176.

At the GAO, EIP further relied on *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570 (2005), which EIP argued stands for the proposition that the Court of Federal Claims has held that it has bid protest jurisdiction to review whether an agency's decision not to issue a solicitation or to conduct a cost comparison before in-sourcing certain services violated various laws and regulations. *See* EIP's Resp. to Mot. for Summary Dismissal, Tab 15, AR 842; *see also* EIP's Comments on the Agency Report, Tab 37, AR 2176 (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999), for the proposition that "[a]s long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction.").

The Federal Circuit has indeed held, consistent with 41 U.S.C. § 111, that a "procurement" includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *See Distributed Sols., Inc. v. United States,* 539 F.3d 1340, 1345-46 (Fed. Cir. 2008). But the cases that EIP cited at the GAO are distinguishable. In *RAMCOR Services,* the trial court had held that it lacked jurisdiction under 28 U.S.C. § 1491(b)(1) to rule

on a preliminary injunction prohibiting the agency from allowing a contractor to act on a newly awarded contract that had been protested to the GAO, after the agency overrode the CICA automatic stay, under 31 U.S.C. § 3553(c)(2). *See RAMCOR*, 185 F.3d at 1287-88. The protestor argued that the agency's override was wrongful. The Federal Circuit found that the protestor's allegations related to 31 U.S.C. § 3553(c)(2) suggested the "violation of a statute or regulation in connection with a procurement or a proposed procurement." *Id.* at 1289. But the question of whether a stay override is "in connection with a procurement" is very different from the issue raised here, where the formulation of mitigation plans has nothing to do with a procurement, beyond analyzing mitigation possibilities.

*LABAT-Anderson* also is distinguishable. The protestor in that case argued that the Government decided to perform work in-house without first conducting a competitive solicitation and a public/private cost comparison, which allegedly violated numerous sources of law that mandate the procurement of supplies and services from the private sector. *See LABAT-Anderson*, 65 Fed. Cl. at 574. Without discussion, the Court of Federal Claims held that this constituted a challenge to an "alleged violation of statute or regulation in connection with a procurement." *Id.* In that case, however, the laws that the Government allegedly violated were all part of the overall procurement scheme for that type of Government need.[11]

There must be some limit to the scope of the term "in connection with a procurement," because taken to its logical extreme, an agency's formulation of high-level policies could be

---

[11] Namely, "(1) title 10 U.S.C. § 2462, directing the Department of Defense to procure services and supplies from the private sector; (2) 32 C.F.R. Parts 169.1 and 1691a1, which give effect to section 2462; (3) Office of Management and Budget Circular A–76 (2003), which contains methods for Government agencies to employ in performing public/private cost comparisons; and (4) Executive Order 12,615, directing Executive agencies to obtain goods and services from private sources." *LABAT-Anderson*, 65 Fed. Cl. at 573.

characterized as part of the process for determining a need. The line is properly drawn well short of the broad jurisdiction that EIP seeks. EIP repackages the Corps' compensatory mitigation decisions as procurement-related, but in fact the purpose of the Corps' analysis was to determine what mitigation would most appropriately replace lost habitats, in compliance with laws, regulations, and policies that have nothing to do with procurement, and irrespective of whether it was later determined that the Corps needed to solicit dredging and construction services. The question of the most appropriate compensatory mitigation for HSDRRS impacts is based upon the nature of the impacts, the maximization of ecological benefits, the need to use on-refuge mitigation for on-refuge impacts, and other issues unrelated to the efficient procurement of services by the Government, which is the purpose of this Court's jurisdiction over bid protests. That is particularly obvious given that EIP has had the opportunity to lodge comments on the Corps' planning process, and that it communicated with Corps decision makers without ever itself suggesting that it challenged the solicitation's terms, as opposed to the mitigation decisions that underlie the procurement.

The disconnect between the Corps' compensatory mitigation decision-making and the subsequent decision to engage in a procurement of dredging and construction services is highlighted by the relief that EIP seeks. EIP requests, *inter alia*, declaratory judgment and a permanent injunction prohibiting the Corps from proceeding with award and performance of the contract under the solicitation. Compl. at 14. To decide whether EIP is entitled to that relief, the Court will need to substitute its judgment for that of the Corps in relation to complex decisions grounded in environmental issues that predate the solicitation, by years in some instances. The general principle that "procurement" is a broad term should not be used to stretch this Court's jurisdiction beyond recognition.

III. This Court Has No Jurisdiction Over EIP's Claims For Declaratory Judgment

EIP requests a declaratory judgment that the Corps violated 33 C.F.R. § 332.3(b) and 33 U.S.C. § 2317b by not applying a preference for purchase of mitigation bank credits. Compl. at 14. It also seeks a declaratory judgment that the Corps violated 10 U.S.C. § 2305(a)(1) by allegedly unreasonably ruling out purchase of mitigation bank credits and improperly bundling distinct and segregable requirements under the New Zydeco Ridge solicitation. *Id.*

Title 28 U.S.C. § 1491(b)(2) authorizes this court to "award any relief that the court considers proper, including declaratory and injunctive relief . . . ." A declaratory judgement on the facts of this case would have no practical effect on the parties, however, since the solicitation is closed and the contract has been awarded. This Court cannot issue a declaratory judgment in such circumstances. "'A declaratory judgment is not available as an academic exercise . . . .'" *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) (quoting *Maryland Citizens for a Representative Gen. Assembly v. Governor of Maryland*, 429 F.2d 606, 611 (4th Cir. 1970)); *see LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 576 (2005).

A declaratory judgment that the Corps was in violation of its own statutes and regulations regarding compensatory mitigation in its completed solicitation would have no practical effect here. It would be an "academic exercise." *PGBA*, 389 F.3d at 1228. The Court does not have authority to issue declaratory relief because in these circumstances such a judgment would be tantamount to issuing an advisory opinion. Thus, to the extent the Court declines to dismiss this matter in full for the other reasons set forth in this motion, EIP must meet the requirements for injunctive relief, which it seeks in Court III of its complaint.

IV. EIP Lacks Standing Because It Is Not A Prospective Bidder

EIP also lacks standing under 28 U.S.C. § 1491(b)(1). EIP cannot establish that it is an "interested party" under that statute, and this Court therefore lacks subject matter jurisdiction.

*See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (holding that "standing is a threshold jurisdictional issue."); *Arcata Associates, Inc. v. United States*, 110 Fed. Cl. 290, 295 (2013). While § 1491(b)(1) does not define "interested party," the Federal Circuit has construed the term in accordance with the definition provided in CICA, namely, ''''an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."" *CGI Fed., Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015) (quoting *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1298 (Fed. Cir. 2001)). Thus, to demonstrate that it has standing, EIP must show (1) that it is an actual or prospective bidder, and (2) that it has a direct economic interest. *CGI Fed.*, 779 F.3d at 1348 (citing *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)).

EIP is neither an actual nor a prospective bidder. EIP never submitted a bid in response to the solicitation, and thus it is not an actual bidder. *See CGI Fed.*, 779 F.3d at 1448. It also cannot establish that it was a prospective bidder. A non-offeror in a bid protest may establish its status as a prospective bidder to a solicitation by filing a protest prior to the close of the proposal period. *See MCI Telecomms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989); *see also Digitalis Educ. Sols.*, 664 F.3d at 1384-85.

By not submitting an offer or filing a protest, EIP has placed itself outside the boundaries of interested party status. *See id.*[12] EIP did not file any formal protest prior to the close of

[12] The trial court in *Bannum, Inc. v. United States*, 115 Fed. Cl. 148 (2014), dismissed the case because the protestor did not establish that it was an "interested party" for purposes of 28 U.S.C. § 1491(b)(1). After affirming the trial court on a different ground, *i.e.*, waiver, the Federal Circuit, in a decision discussed at length in Section V of this brief, noted that it did not need to address the "interested party" issue. *Bannum v. United States*, 779 F.3d 1376, 1381 (Fed. Cir. 2015). The Federal Circuit did note, however, that the "interested party" inquiry "itself has

bidding on August 4, 2016.[13] EIP in its complaint characterizes its August 3, 2016 letter to the Corps as a protest, claiming that the letter, "while not labeled as such, met all material requirements of an agency-level protest challenging the propriety of USACE's decision to not purchase mitigation bank credits from EIP." Compl. ¶ 45.

EIP is incorrect. EIP described the purpose of the August 3, 2016 letter as being "to provide comments for the District's consideration on [SIER 1] and planned Contract Award . . . ." Tab 1b, AR 293. The word "protest" does not appear in the letter. Tab 1b, AR 293-302. Even more critically, EIP did not file its letter as an agency-level protest. The Federal Acquisition Regulations mandate that "[a]ll protests filed directly with the agency will be addressed to the contracting officer or other official designated to receive protests." FAR § 33.103(d)(3). The solicitation then incorporated by full text FAR § 52.233-2, "Service of Protest (Sep 2006)" to require that "[p]rotests . . . that are filed directly with an agency . . . shall be served on the Contracting Officer," and also to require the protestor to secure a mail receipt. Tab 16a, AR 893. Charles Zammitt, Jr. was identified as the contracting officer in the solicitation. Tab 16a, AR 893. The solicitation also included Mr. Zammitt's postal address.

Rather than mailing the August 3, 2016 letter to Mr. Zammitt and securing a receipt as proof of having done so, as required by the solicitation and the FAR, EIP instead e-mailed it to Col. Michael Clancy, the new Commander of the Corps' New Orleans District, with copies to Mark Wingate and Troy Constance of the Corps. Tab 6, AR 338-39. None of these individuals

---

taken into account, in certain circumstances, whether a party has timely presented and diligently pressed its protest." *Bannum*, 779 F.3d at 1381 (citing *CGI Fed.*, 779 F.3d at 1346).

[13] EIP's protests to the GAO (filed on August 15, 2016) and to this Court (filed on November 18, 2016, three days after the GAO's dismissal) were both subsequent to the August 4, 2016 bid opening. Tab 30, AR 2057.

were the contracting officer identified in the solicitation, and Mr. Wingate in his GAO declaration explicitly disclaimed any direct authority over Corps procurement actions, including the issuance or rescission of solicitations. Tab 34, AR 2136. Moreover, Mr. Dilks apparently did not correctly address the e-mail to Col. Clancy, requiring Mr. Dilks to resend the e-mail at 4:44 p.m. on August 4, 2016, subsequent to bid opening. Tab 6, AR 338.

In sum, EIP never filed a formal protest. In addition to not being filed, EIP's letter also fails to include the required contents of a formal agency-level protest. Agency-level protests are required to include, *inter alia*, the following information:

> (ii) Solicitation or contract number.
>
> (iii) Detailed statement of the legal and factual grounds for the protest, to include a description of resulting prejudice to the protester.
>
> (iv) Copies of relevant documents. . . .
>
> (vii) All information establishing that the protester is an interested party for the purpose of filing a protest.
>
> (viii) All information establishing the timeliness of the protest.

FAR § 33.103(d)(2). The letter provides only a partial solicitation number; does not contain the word "prejudice"; does not attach any documents other than a list of technical arguments generated by EIP; contains no claims that EIP is an interested party to any protest; and does not attempt to establish that the purported protest is timely. Tab 1b, AR 293-302. (To the contrary, the letter shows that EIP did not even know when the bid opening would occur.)

EIP's failure to lodge a formal agency-level protest must be taken in the context of its longstanding efforts to convince the Corps to buy its credits for HSDRRS mitigation. EIP engaged the Corps as early as March 12, 2013, at that time questioning whether the Corps was following the allegedly required mitigation hierarchy. Tab 6, AR 341-42. In PIER #36, the

Corps identified a Corps-constructed project as the then-likely mitigation for brackish marsh impacts, subject to additional investigation, design, and NEPA evaluation. Tab 20, AR 1157-58. EIP submitted comments prior to the finalization of PIER #36, on September 18, 2013, again alleging that the Corps was not giving due preference to mitigation banks. Tab 21, AR 1519-24. These communications demonstrate that, three years before the close of bidding on the solicitation, EIP already was arguing that the Corps was not following the mitigation hierarchy, the very claim that is now the basis for Count I of EIP's complaint. *See* Compl. ¶ 57. EIP did not comment on the draft SIER 1, which analyzed at length the proposed mitigation of brackish marsh impacts through restoration activities at New Zydeco Ridge. Tab 24, AR 1963; Tab 11, AR 448. However, throughout 2016, EIP has directly engaged high-level Corps personnel to argue that EIP's credits should be used for HSDRRS mitigation. *See* Statement of Facts, ¶¶ 36-41.

EIP engaged in an extensive informal attempt to convince the Corps to use EIP's credits for HSDRRS mitigation. The August 3, 2016 letter was merely one more such attempt, and the Court should reject EIP's post-hoc characterization of the letter as a formal agency-level protest. Because it cannot meet the first prong of the interested party test by showing that it is a prospective bidder, EIP cannot establish standing.

Moreover, for the same reason that EIP cannot show that it was a prospective bidder, it also cannot demonstrate an economic interest in the procurement. *See Digitalis Educ. Sols.*, 664 F.3d at 1385 (holding that party that was not a prospective bidder lacked an economic interest for the same reasons).

## V. EIP Has Waived Its Claims By Failing To Protest Prior To Bid Opening

The doctrine of waiver compels dismissal of EIP's protest. "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*,

304 U.S. 458, 464 (1938). To be effective, a waiver "must be a voluntary, knowing and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." *Am. Airlines, Inc. v. United States*, 77 Fed. Cl. 672, 681 (2007) (quotations and citations omitted), *aff'd*, 551 F.3d 1294 (Fed. Cir. 2008). "Waiver requires only that the party waiving such right do so 'voluntarily' and 'knowingly' based on the facts of the case." *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1563 (Fed. Cir. 1990) (citing *Brookhart v. Janis*, 384 U.S. 1, 4, 5 (1966)). Although a waiver must be voluntary and knowing, it "need not be express, but may be inferred from a pattern of conduct." *Am. Airlines, Inc.*, 77 Fed. Cl. at 681; *see also Seaboard Lumber Co.*, 903 F.2d at 1563 ("Waiver can be either express or implied." (citations omitted)).

In *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007), a preaward protest, the Federal Circuit made clear that untimely protests would not be permitted:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

*Id.* at 1313.

The Federal Circuit recently reiterated and strengthened this rule in *Bannum, Inc. v. United States*, 779 F.3d 1376, 1381 (Fed. Cir. 2015). In *Bannum*, the protestor challenged the terms of the agency's solicitation. *Id.* at 1381. The protestor did not file a formal agency-level protest (or a protest at the GAO or Court of Federal Claims) prior to bid opening. *Id.* at 1381. The protestor did, however, make the agency aware of its objections to the solicitation. For example, following an amendment to the solicitation, the protestor responded with a six-page letter, labeled "Final Proposal Revision # 3 and AGENCY PROTEST," in which it restated its earlier price proposal and noted that those prices "'do not, and cannot, reflect any consideration

for the effects of Amendment 5' because of the 'enormous amount of information [that] is required prior to pricing this new contract requirement.'" *Id.* at 1378. Bannum repeated its objection four months later, when the government asked the bidders for final bids that confirmed their pricing after incorporating updated wage rates. *Id.*[14] Bannum then filed a GAO bid protest after the contract was awarded, and a protest with this Court after the GAO protest was dismissed. *Id.* at 1378-79.

The trial court dismissed Bannum's suit, finding that Bannum was not an "interested party" entitled to bring a protest under 28 U.S.C. § 1491(b). *Id.* at 1378. The Federal Circuit affirmed the dismissal, but on different grounds. The Federal Circuit noted that it was undisputed that the Government had received notice of Bannum's dissatisfaction with the solicitation, but that was not sufficient:

> We conclude . . . that mere notice of dissatisfaction or objection is insufficient to preserve Bannum's defective-solicitation challenge. The solicitations at issue and the governing regulations put Bannum on notice of the formal requirements for filing a "protest" that would trigger an agency obligation of response and prompt resolution. Bannum did not comply with those requirements; nor did it pursue other available means of formal protest (*e.g.*, to the GAO or the Court of Federal Claims) until after the awards. In these circumstances, it waived its solicitation challenges.

*Id.* at 1380. The Federal Circuit described this approach as implementing Congress's directive in the Administrative Dispute Resolution Act (ADRA) of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874, that courts "'shall give due regard to . . . the need for expeditious resolution' of protest claims." *Bannum*, 779 F.3d at 1380 (quoting 28 U.S.C. § 1491(b)(3) and citing *Blue &*

[14] Bannum's counsel conceded at oral argument that these communications did not constitute a formal agency-level protest. *Id.* at 1381.

*Gold Fleet*, 492 F.3d at 1313). The court of appeals further explained that the requirement of a formal protest would help reduce expenses and prevent delay:

> In this context, clarity is not just readily achievable but important. Requiring that the prescribed formal routes for protest be followed (to avoid waiver) reduces uncertainty about whether the issue is joined and must be resolved, and thereby helps prevent both the wasted and duplicative expenses (of all bidders and the government) and the delayed implementation of the contract that would likely follow from laxer standards of timely presentation of solicitation challenges.

*Id*. The Federal Circuit therefore held that Bannum had waived its objections to the solicitation by failing to avail itself of any of its three protest options prior to the close of bidding. *Id.* at 1381.[15]

*Bannum* controls here. For the reasons discussed in Section IV, EIP did not submit a formal agency level protest; in particular, EIP's letter dated August 3, 2016 did not constitute such a protest. The Federal Circuit in *Blue & Gold Fleet* and *Bannum* set a bright-line requirement designed to avoid a solicitation imperiled by a protestor that waited in the wings. EIP declined to pursue the protest options available to it in a manner that could have reduced inefficiency and confusion, apparently hoping to achieve resolution outside of procurement channels. By doing so, EIP has waived its protest rights.

VI. <u>EIP States No Claim For A Violation Of 33 C.F.R. § 332.3(b)</u>

To the extent the Court declines to dismiss the case for lack of subject matter jurisdiction, it should partially dismiss Count I of EIP's complaint for failure to state a claim. EIP alleges that the Corps violated "federal statutes and regulations establishing a clear preference for use of

[15] The "close of bidding" is the time at which bid proposals are due. *See Phoenix Mgmt., Inc. v. United States*, 125 Fed. Cl. 170, 183 (2016).

mitigation banks." Compl. ¶ 53. EIP points to one regulation and one statute in support of its claim – 33 C.F.R. § 332.3(b) and 33 U.S.C. § 2317b, respectively.

The regulation on which EIP relies – 33 C.F.R. § 332.3(b) – does not apply to a Corps-constructed mitigation project. The regulation is the product of 2003 legislation in which Congress required the Secretary of the Army, acting through the Chief of Engineers, to issue regulations "establishing performance standards and criteria for the use, consistent with section 404 of the [Clean Water Act], of on-site, off-site, and in-lieu fee mitigation and mitigation banking as compensation for lost wetlands functions in permits issued by the Secretary of the Army under such section." National Defense Authorization Act for Fiscal Year 2004, Pub. Law No. 108-136, § 314(b), 117 Stat. 1392, 1431.

In April 2008, the Corps and the Environmental Protection Agency (EPA) issued the Final Rule on Compensatory Mitigation for Losses of Aquatic Resources (Final Rule), 73 Fed. Reg. 19,594 (April 10, 2008), which implemented regulations pursuant to the congressional mandate. *See* 33 C.F.R. § 332.1. Consistent with that mandate, the Corps and EPA articulated the purpose of the regulations as follows:

> The purpose of this part is to establish standards and criteria for the use of all types of compensatory mitigation . . . to offset unavoidable impacts to waters of the United States authorized through the issuance of Department of the Army (DA) permits pursuant to section 404 of the Clean Water Act (33 U.S.C. 1344) and/or sections 9 or 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 401, 403).

33 C.F.R. § 332.1(a)(1). Thus, the Congressional authorization and the regulations themselves make clear that the Final Rule applies only to permits issued by the Department of the Army (*i.e.*, the Corps in this context) under section 404 of the Clean Water Act and/or sections 9 or 10 of the Rivers and Harbors Act of 1899. *See also* 40 C.F.R. § 230.91.

The Corps does not issue itself permits for its own activities. *See* 33 C.F.R. § 336.1. Instead, the Corps authorizes its own activities by applying applicable substantive requirements. *Id.*; *see Idaho Rivers United v. United States Army Corps of Engineers*, 2016 WL 498911, *19-20 (W.D. Wa. Feb. 9, 2016); *New Jersey v. United States Army Corps of Engineers*, 2011 WL 115878, *11 (D.N.J. Jan 13, 2011). As explained above, 33 C.F.R. Part 332 itself states that it is only applicable to compensatory mitigation for impacts authorized through permits issued by the Corps. Because the Corps does not issue permits to itself, those regulations are not applicable to Corps actions. EIP claims that the regulations are binding on the Corps, Compl. ¶ 55, but it provides no support for that statement. As a matter of law, 33 C.F.R. § 332.3 is not applicable to the Corps, and Count I should be dismissed insofar as it relies on that regulation.

## CONCLUSION

For the foregoing reasons, we respectfully request the Court to dismiss EIP's complaint for lack of subject-matter jurisdiction or, in the alternative, to dismiss the complaint in part for failure to state a claim.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Assistant Director

s/Geoffrey M. Long
GEOFFREY M. LONG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Telephone: (202) 307-0159
Fax: (202) 309-0972
E-Mail: Geoffrey.M.Long@usdoj.gov

December 9, 2016

Attorneys for Defendant