**Redacted Version**

**~~Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order~~**

No. 16-1549C
(Senior Judge Bruggink)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

---

ECOSYSTEM INVESTMENT PARTNERS,
Plaintiff,

v.

THE UNITED STATES,
Defendant,

and

CROSBY DREDGING, LLC,
Defendant-Intervenor.

---

# DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

---

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

MARTIN F. HOCKEY, JR.
Assistant Director

GEOFFREY M. LONG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Telephone: (202) 307-0159
Fax: (202) 309-0972

December 30, 2016

Attorneys for Defendant

TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 1

I. EIP Mischaracterizes The Corps' Actions ........ 1

II. EIP's Attempt To Connect The Development Of The Mitigation Plan To The Procurement Of Dredging Services Goes Far Beyond The Cases On Which EIP Relies ........ 3

III. EIP Lacks Standing Because It Did Not File A Timely Protest ........ 6

IV. EIP Has Waived Its Protest And Its Attempt To Distinguish *Bannum* Is Unpersuasive ........ 7

V. 33 C.F.R. § 332.3(b) Is Not Binding When The Corps Secures Its Own Mitigation ........ 9

CONCLUSION ........ 13

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Bannum v. United States*,
779 F.3d 1376 (Fed. Cir. 2015)........................................................................................ 7, 8

*Blue & Gold Fleet, L.P. v. United States*,
492 F.3d 1308 (Fed. Cir. 2007)........................................................................................... 9

*CCL, Inc. v. United States*,
39 Fed. Cl. 780 (1997) ......................................................................................................... 6

*Distributed Solutions, Inc. v. United States*,
539 F.3d 1340 (Fed. Cir. 2008)........................................................................................... 4

*Google, Inc. v. United States*,
95 Fed. Cl. 661 (2011) ......................................................................................................... 6

*LABAT-Anderson, Inc. v. United States*,
65 Fed. Cl. 570 (2005) ......................................................................................................... 5

*MCI Telecommunications Corp. v. United States*,
878 F.2d 362 (Fed. Cir. 1989)............................................................................................. 6

*Phoenix Mgmt., Inc. v. United States*,
125 Fed. Cl. 170 (2016) ....................................................................................................... 8

*Savantage Financial Services, Inc. v. United States*,
81 Fed. Cl. 300 (2008) ......................................................................................................... 4

*VFA, Inc. v. United States*,
118 Fed. Cl. 735 (2014) ....................................................................................................... 5

## Statutes

National Defense Authorization Act for Fiscal Year 2004, Pub. Law No. 108-136,
§ 314(a), 117 Stat. 1392, 1431........................................................................................ 11

Water Resources Reform and Development Act of 2014,
Pub. L. No. 113-121, § 7002(2)(4), 128 Stat. 1193 (2014) ..................................................... 11

Water Resources Development Act of 2007,
Pub .L. No. 110-114, 121 Stat. 1041 (“WRDA 2007”)........................................................... 10

28 U.S.C. § 1491(b)(1) ........................................................................................................ 6, 13

28 U.S.C. § 1491(b)(2) ........................................................................................................... 13

Table of Authorities - continued

Statutes - continued

33 U.S.C. § 1344 ... 9

33 U.S.C. § 2283 ... 10, 11, 1

33 U.S.C. § 2283(d)(2) ... 10

33 U.S.C. § 2283(d)(3)(A) ... 9, 10

33 U.S.C. § 2283(d)(3)(B) ... 10

42 U.S.C. § 4321 ... 4

Regulations

Final Rule on Compensatory Mitigation for Losses of Aquatic Resources,
73 Fed. Reg. 19,594 (April 10, 2008) ... 11, 12, 13

33 C.F.R. Part 332 ... 11

33 C.F.R. § 332.3(b)(1) ... 12

33 C.F.R. § 332.5 ... 11

33 C.F.R. § 332.3(b) ... 9, 10, 11

FAR § 33.103(b) ... 8

Rules

RCFC 12(b)(1) ... 13

**Redacted Version**

~~**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**~~

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| ECOSYSTEM INVESTMENT PARTNERS, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 16-1549C |
| | ) | Senior Judge Bruggink |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| And | ) | |
| CROSBY DREDGING, LLC, | ) | |
| Defendant-Intervenor. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Pursuant to Rule 12 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully submits this reply in support of its motion to dismiss the bid protest complaint of plaintiff, Ecosystem Investment Partners (EIP).

ARGUMENT

I. EIP Mischaracterizes The Corps' Actions

We explain below why EIP's arguments are insufficient for it to avoid dismissal, including because the actions that EIP complains of were not in connection with a procurement and because EIP has waived its claims. As an initial matter, however, it is worth noting the gulf between EIP's negative characterization of the Corps' conduct and the actual uncontested record. In our moving brief, we described the process that the United States Army Corps of Engineers (Corps) undertook to develop a mitigation plan to compensate for impacts caused by construction of the Hurricane and Storm Damage Risk Reduction System (HSDRRS), which effort began in earnest in 2010. *See* Def. Mot. to Dismiss at 6, ECF No. 18. "PIER #36," which

was finalized on November 23, 2013, examined 400 mitigation options and, after screening options out, proposed purchasing some mitigation bank credits for HSDRRS impacts (those purchases did later occur). The Corps in PIER #36 also proposed further examination of a potential Corps-constructed marsh restoration project to mitigate for HSDRRS brackish marsh impacts, including "off-refuge" brackish marsh impacts. *See* Mot. at 6-8. Notably, EIP commented on the draft of PIER #36 in September 2013, and the Corps responded to those comments in the final report. Mot. at 15.

On July 9, 2014, the Corps released for public comment "SIER 1," as described in our moving brief. Mot. at 8-10. The Corps indicated in SIER 1 that off-refuge brackish marsh impacts would be mitigated by an on-refuge marsh restoration project. Mot. at 9-10. The Corps indicated that the Corps, where appropriate, would consider use of mitigation bank credits, but that it would not be using bank credits in this instance. Mot. at 10-11.

EIP did not comment on the draft SIER 1 before it was finalized in October 2015. Mot. at 15. That perhaps is because EIP during the public comment period did not have enough credits to provide the needed mitigation for HSDRRS off-refuge brackish marsh impacts. Mot. at 13-14. Despite EIP's lack of comment on the mitigation plan set forth in SIER 1, the Corps actively engaged with EIP even after the record of decision was finalized. Mot. at 15-18. During that time, however, the Corps did not waver from its commitment to conduct Corps-constructed mitigation. *See* Tabs 34-35, AR 2136-41.

These undisputed facts demonstrate that the agency communicated its decision-making process in the course of drafting and finalizing PIER #36 and SIER 1. EIP nonetheless casts aspersions, claiming that the Corps "disregarded its own regulations" and "flaunted" a preference for mitigation banks. Pl. Resp. to Def. Mot. to Dismiss at 5, ECF No. 22. EIP implies that the

Corps misled it, stating without support that EIP was "made to think" that it was engaged in a two-way conversation. Resp. at 23. EIP further suggests that the Government now is attempting to "cloak" its mitigation decision as a policy matter, to avoid this Court's scrutiny. *Id.* at 10. EIP believes that the Court should "send a clear message to the Corps." *Id.* at 5.

EIP's statements have no relevance to the jurisdictional questions that we raise in our motion. In the event, however, that the Court is concerned about those statements, we note that EIP does not challenge our factual recitation, and that the recitation provides no support for EIP's claims. The relevant facts and the law squarely require dismissal. The Court should reject EIP's attempt to cloud the resolution of our motion with mischaracterizations of the Corps' actions.

## II. EIP's Attempt To Connect The Development Of The Mitigation Plan To The Procurement Of Dredging Services Goes Far Beyond The Cases On Which EIP Relies

EIP argues that "the Corps' decision to satisfy its mitigation requirements through a construction project instead of through purchase of mitigation bank credits" was "'in connection with a procurement or proposed procurement' because there is a direct connection between the challenged decision and the Corps' issuance of the New Zydeco Ridge solicitation that is the subject of this protest action." Resp. at 7. But the cases that EIP cites in support of this proposition are not analogous to the sweeping bid protest jurisdiction that EIP seeks to assert here.[1]

[1] On Monday, November 21, 2016, three days after filing its bid protest complaint, EIP filed an Administrative Procedure Act (APA) lawsuit in the United States District Court for the Eastern District of Louisiana. *Ecosystem Investment Partners v. United States*, No. 16-cv-16504 (E.D. La.). The APA lawsuit is based upon the same conduct that EIP challenges in this bid protest lawsuit. The Government's motion to dismiss for lack of standing currently is being briefed in that matter.

*Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008), is an example. In that case, the protestors alleged that the Government had purposefully avoided issuing a formal solicitation, and thus the requirements of Federal procurement law, by issuing a request for information (RFI) and then, instead of engaging in a procurement, using the RFI responses to develop a task order for an existing contractor; the task order assigned the contractor with noncompetitive procurement authority to purchase services identified in the responses. *See id.* at 1344. These allegations were held to be "in connection with a procurement," in the context of the Government allegedly specifically avoiding competitive procurement law. In contrast, EIP does not credibly allege any attempt by the Corps to avoid Federal procurement law. Instead, EIP simply alleges that the Corps erred in its determination of mitigation as part of the process under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq*.

*Savantage Financial Services, Inc. v. United States*, 81 Fed. Cl. 300 (2008), also is not apposite. In *Savantage*, the Department of Homeland Security (DHS) conducted a sole-source procurement for financial systems application software. DHS decided to standardize its software on the Oracle and SAP systems, signing a "Brand Name Justification" instead of conducting a competition. DHS then issued a solicitation for services to migrate to these systems. The protestor challenged the underlying standardization decision to use Oracle and SAP. The Court found that DHS had expanded its systems contracts with Oracle and SAP without any competition for the new work. *Id.* at 305. Specifically, the Court ruled that the "expansion of work fits squarely within the congressional definition of 'procurement' because it is an acquisition of additional property or services from Oracle and SAP." *Id.*

Thus, the Court in *Savantage* simply held that acquiring new work from a private vendor is a procurement action by the Government. *See VFA, Inc. v. United States*, 118 Fed. Cl. 735, 741 (2014) (distinguishing *Savantage*). The analogue in the instant case is the Corps' decision, upon completion of its mitigation plan, to competitively solicit to procure dredging and construction services. The Corps' decision-making with respect to procuring those services does indeed implicate competition and procurement issues. But the underlying determination of the most ecologically preferable mitigation option does not implicate those considerations, and the determination therefore is not "in connection with a procurement."[2] That process had been completed after public review and comment, and well before the procurement was undertaken.

EIP also relies on *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570 (2005). There, the plaintiff alleged that the agency unlawfully failed to complete cost comparisons of in-house versus contractor performance. As we noted in our moving brief, however, the alleged violations of regulations by the agency in that case were part of the overall procurement scheme for that type of Government need – the relevant regulations and other allegedly-violated sources of law all related to efficient procurement of resources. *See* Mot. at 22. The same cannot be said for the Corps' determination of appropriate compensatory mitigation through the NEPA process, which is focused on a wholly separate set of environmental concerns that stand apart from the procurement process.

[2] EIP relies on other cases for the proposition that this Court has exercised jurisdiction over protest actions challenging sole-source or limited sources justifications, set-aside determinations, bundling of requirements, and brand name only specifications. Resp. at 12 nn.19-22. Whether or not these decisions are correct, they are substantially different from EIP's claim, since there is a clear distinction here between the NEPA evaluation process and the acquisition process.

III. <u>EIP Lacks Standing Because It Did Not File A Timely Protest</u>

EIP does not have standing because it is not an "interested party" within the meaning of 28 U.S.C. § 1491(b)(1). EIP argues that it may qualify as a prospective bidder even though it has not submitted a proposal, so long as the violations of statute or regulation at issue in the protest deprived the plaintiff of the opportunity to submit a proposal. *See* Resp. at 26. In support of its argument, EIP cites *CCL, Inc. v. United States*, 39 Fed. Cl. 780 (1997) (Bruggink, J.), and *Google, Inc. v. United States*, 95 Fed. Cl. 661 (2011). Those cases are distinguishable, however. In *CCL*, the Government had declined to issue a solicitation, and the protestor therefore could not have protested before the solicitation closed. *CCL*, 39 Fed. Cl. at 789. The same was true in *Google*, where the Court relied on *CCL* for the proposition that it is enough that a protestor "'likely would have competed for the contract had the government publicly invited bids or requested proposals.'" *Google*, 95 Fed. Cl. at 673 (quoting *CCL*, 39 Fed. Cl. at 790).

Thus, the Court in both cases was faced with a question of how a protestor could establish standing where the Government declined to issue a solicitation. But that is not what happened here. The Corps' solicitation for dredging and construction services, on which EIP hangs its case, opened on May 13, 2016, and closed on August 4, 2016. The Corps' decision to engage in Corps-conducted restoration at New Zydeco Ridge for off-refuge impacts was firmly established no later than October 20, 2015, when SIER 1 was finalized. Nothing therefore precluded EIP from establishing its status as a prospective bidder by filing a protest prior to the closing of the solicitation. On these facts, *MCI Telecommunications Corp. v. United States*, 878 F.2d 362 (Fed. Cir. 1989), applies. In *MCI*, the protestor sought a resolicitation, but it had not submitted a bid, and it did not lodge a protest prior to bid opening. *Id.* at 364. The Federal Circuit held that the protestor was not a prospective bidder, because it failed to avail itself of these options. *See id.* at 365. EIP might argue that it would have been futile to submit a bid, but

it certainly believes that it could have filed a protest, at least as to the terms of the solicitation. It did not do so, and *MCI* applies.

IV. EIP Has Waived Its Protest And Its Attempt To Distinguish *Bannum* Is Unpersuasive

As we explained in our moving brief, EIP has waived its claims based on many of the same facts that deprive it of standing. Mot. at 28-31. In response, EIP argues that *Bannum v. United States*, 779 F.3d 1376 (Fed. Cir. 2015), does not apply, because "[a]lthough the *Bannum* decision speaks of formally protesting, the case really turned on the fact that the plaintiff's actions, *i.e.*, its active participation in the procurement to the point of award, belied its words buried in a proposal footnote stating that it was reserving its 'right' to protest." Resp. at 21.

That is not a reasonable interpretation of *Bannum*. The Federal Circuit mandated a bright-line rule in that case. In language that we quoted at length in our moving brief, the court of appeals took issue with the protestor's failure to lodge a formal protest, despite it being "on notice of the formal requirements for filing a 'protest' that would trigger an agency obligation of response and prompt resolution." *Bannum*, 779 F.3d at 1380. The court of appeals concluded that "[r]equiring that the prescribed formal routes for protest be followed . . . reduces uncertainty about whether the issue is joined and must be resolved, and thereby helps prevent both the wasted and duplicative expenses (of all bidders and the government) and the delayed implementation of the contract that would likely follow from laxer standards . . . ." *Id.*

This language refutes EIP's claim that the Federal Circuit's narrow concern was that the protestor in *Bannum* had participated in the solicitation while purporting to reserve its right to protest in a footnote. *See* Resp. at 21. Instead, the Federal Circuit broadly held that some formal protest must be pursued prior to bid opening.

EIP did not "do[]exactly what [it] should do to resolve [its] concerns directly with the agency." Resp. at 23. And EIP did not attempt to "resolve concerns 'at the contracting officer

level through open and frank discussions.'" Resp. at 23 (quoting FAR § 33.103(b)). To the contrary, EIP never engaged the contracting officer prior to bid opening, and it focused not on the procurement of dredging and construction services, but rather on the Corps' previously established plan to conduct its own restoration project for brackish marsh impacts, including off-refuge brackish marsh impacts.

Even EIP did not apparently view its objections as a bid protest, as evidenced by its not using the term in its August 3, 2016 letter. EIP evidently was not aware on that date that bid opening had been publicly announced to occur the next day. *See* Mot. at 17, n.9. EIP's own confusion about the procurement's status is exactly the type of problem that the Federal Circuit sought to address in *Bannum*, by creating a rule that would "reduce[] uncertainty about whether the issue is joined and must be resolved." *Bannum*, 779 F.3d. at 1380.

The Court also should reject EIP's argument that EIP did, in fact, lodge a formal bid protest. Resp. at 24-25. EIP suggests that its protest to the GAO was timely because bid award had not occurred. *See* Resp. at 25. EIP is correct the Federal Circuit in *Bannum* referred to a protestor that had not pursued a GAO or Court of Federal Claims protest "'*until after the awards*.'" *See* Resp. at 24-25 (quoting *Bannum*, 779 F.3d at 1380 (emphasis EIP's)). But the case law makes clear that bid opening, not bid award, is the point by which a protest to a solicitation must be lodged. *See Phoenix Mgmt., Inc. v. United States*, 125 Fed. Cl. 170, 183 n.8 (2016) (holding that while a post-solicitation, pre-award protest might be timely where the solicitation was amended after the proposal due date, that would not be so where the solicitation was not amended after the close of the bidding process; in such instances, the relevant date for waiver was when the bid period closed). The distinction between a protest after bid opening but prior to award, on the one hand, and a protest after bid award, on the other, was not raised in

*Bannum*, so the Federal Circuit had no reason to address the issue. However, the Federal Circuit did hold in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so *prior to the close of the bidding process* waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Id.* at 1313 (emphasis added).

As further discussed in our moving brief, the solicitation, the Federal Acquisition Regulations, and Federal Circuit case law all warn potential protestors to proceed formally before bidding closes, and provide clear mechanisms to do so. EIP ignored all of these warnings, and now seeks to disrupt a completed process. The Court should have no trouble finding that EIP has waived its right to protest.

V. <u>33 C.F.R. § 332.3(b) Is Not Binding When The Corps Secures Its Own Mitigation</u>

In our moving brief, we argued that 33 C.F.R. § 332.3(b) is not binding when the Corps secures mitigation for its own environmental impacts. That is so, we argued, because the legislation directing the Corps to issue mitigation regulations, and the regulations themselves, clearly state that those regulations are to apply to permits issued under section 404 of the Clean Water Act, 33 U.S.C. § 1344. Such permits are not required for Corps-constructed projects as the Corps does not issue permits to itself. Mot. at 32-33. The regulations are *per se* accordingly limited in scope. *See id.*

EIP offers four arguments in support of its contention that the regulation is binding. Resp. at 27-34. First, EIP argues that the Water Resources Development Act (WRDA), 33 U.S.C. § 2283(d)(3)(A), makes the regulation applicable to a Corps-constructed mitigation project. Resp. at 28. That statute states that "the Secretary shall ensure that the mitigation plan for each water resources project complies with, at a minimum, the mitigation standards and

policies established pursuant to the regulatory programs administered by the Secretary." 33 U.S.C. § 2283(d)(3)(A).

The statute does not create the broad limitation on the Corps action that EIP ascribes to it. The referenced subsection does not prescribe what mitigation must be selected for a given project. That is in contrast to the immediately preceding subsection, 33 U.S.C. § 2283(d)(2), entitled "Selection and design of mitigation projects." 33 U.S.C. § 2283(d)(2).[3] And that subsection requires only that the Corps "select and design mitigation projects using a watershed approach . . . ." *Id.* It does not reference any preference for mitigation banks. *See id.*

The inapplicability of section 2283(d)(3)(A) is further confirmed by the immediately subsequent subsection. Titled "Inclusions," section 2283(d)(3)(B) provides context for the immediately "general" requirements in section 2283(d)(3)(A). The subsection requires that "[a] specific mitigation plan for a water resources project under paragraph (1) shall include, at a minimum" seven topics, none of which relate to the preference for mitigation banks that is the focus of EIP's complaint. *See* 33 U.S.C. § 2283(d)(3)(B). Thus, it is clear in context that the statutory language that EIP relies on does not "bind" the Corps to adhere to 33 C.F.R. § 332.3(b), particularly with respect to any preference for mitigation banks.

Moreover, at the time when 33 U.S.C. § 2283 was enacted in 2007,[4] the Final Rule on Compensatory Mitigation for Losses of Aquatic Resources (Final Rule), 73 Fed. Reg. 19,594 (April 10, 2008), of which 33 C.F.R. § 332.3(b) is a part, was not yet in existence. Thus, Congress could not have been specifically referring to the regulation. And when the statute was

---

[3] We have set forth the relevant provisions of 33 U.S.C. § 2283 in a statutory addendum to this reply brief.

[4] Water Resources Development Act of 2007, Pub .L. No. 110-114, 121 Stat. 1041 ("WRDA 2007").

amended in 2014,[5] Congress did not choose to state that any mitigation bank preference applied to the Corps' conduct of mitigation. Finally, many of the mitigation plan requirements set forth in 33 U.S.C. § 2283 are duplicative of the requirements for mitigation plans in 33 C.F.R. Part 332. *Compare* 33 C.F.R. § 332.5 (criteria for ecological success) *with* 33 U.S.C. § 2283(d)(3)(B)(ii) (criteria for ecological success). There would be no reason for this if the statute made the regulation binding on the Corps as a blanket proposition.

EIP also claims that the Corps has "reviewed its existing mitigation planning guidance for compliance with the regulations contained in 33 C.F.R. Part 332." Resp. at 29 (citing Implementation Guidance for Section 2036(a) of the Water Resources Development Act of 2007 – Mitigation for Fish and Wildlife and Wetlands Losses (Aug. 31, 2009) (Section 2036(a) Guidance), at 2). That is not what the cited guidance says. In it, the Corps concludes that its "existing guidance [Engineer Regulation 1105-2-100] on mitigation planning is *consistent with* the standards and policies of the Corps Regulatory Program for wetlands mitigation and Section 2036(a) of WRDA 2007." Section 2036(a) Guidance at 2 (emphasis added). The Corps' review of its planning regulation (ER 1105-2-100) for consistency does not mean that the mitigation regulations at 33 C.F.R. Part 332 are somehow "binding." In fact, review of the entire guidance document illustrates that specific provisions from 33 CFR Part 332 are never mentioned and nowhere does the guidance state that those regulations should be applied to Corps mitigation planning.

EIP's second argument for the applicability of 33 C.F.R. § 332.3(b) is that the screening criteria established by the Corps for the evaluation of HSDRRS compensatory mitigation options

---

[5] Water Resources Reform and Development Act of 2014, Pub. L. No. 113-121, § 7002(2)(4), 128 Stat. 1193 (2014).

tracks and cites 33 C.F.R. § 332.3(b)(1). *See* Resp. at 30. Thus, EIP argues, the regulation is "applicable." *Id.* But there is a distinction between material that is relevant and that which is binding. That the Corps found some portion of the regulation to be relevant does not render it binding.

EIP's third argument for the applicability of the regulation stems from the National Defense Authorization Act for Fiscal Year 2004, Pub. Law No. 108-136, § 314(a), 117 Stat. 1392, 1431, which states that the Corps may make payments to a mitigation bank that is approved in accordance with the Final Rule (as a successor regulation to those referenced in the statute). *See* Resp. at 30-32. EIP thus concludes that because the Corps may purchase credits from a mitigation bank created under the Final Rule, the qualified preference for mitigation banks in the Final Rule is binding on the Corps. Resp. at 32. EIP does not explain, however, why Congress's grant of authority to buy mitigation bank credits would circumscribe the Corps' mitigation decision-making by forcing a decision to buy mitigation bank credits over other options, and there is no logical reason why it would do so.

Finally, EIP makes a policy argument that the Corps' alleged failure to apply the mitigation bank preference will discourage investment in mitigation bank projects. Resp. at 32-34. But none of the materials quoted by EIP – namely, Congress's authorization of the Final Rule and the Final Rule itself – may reasonably be described as limiting the Corps' options in determining the most appropriate compensatory mitigation for Corps projects. To the contrary, the materials simply are not applicable to a Corps-constructed mitigation project. EIP uses language out of context when it states that a purpose of the Final Rule is to provide "'clear and consistent national standards and requirements.'" Resp. at 34 (quoting 73 Fed. Reg. 19,593, 19,607 (Apr. 10, 2008)). The full sentence, located in a section of regulatory comments titled

"Regional Issues," states that "The rule provides district engineers the flexibility to address permit-specific situations, while ensuring clear and consistent national standards and requirements." 73 Fed. Reg. 19,593, 19,607. In context, the commentary clearly is directed at the establishment of standards and requirements in the issuance of Section 404 permits, and does not serve to make Clean Water Act permit requirements applicable to compensatory mitigation for Corps projects.[6]

## CONCLUSION

For the foregoing reasons and those set forth in our moving brief, we respectfully request the Court to dismiss EIP's complaint for lack of subject-matter jurisdiction or, in the alternative, to dismiss the complaint in part for failure to state a claim.

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Assistant Director

[6] In our motion we also argued that the Court lacks jurisdiction over EIP's declaratory judgment claims. Mot. at 24. For the reasons set forth in this reply, we continue to assert that the Court lacks subject matter jurisdiction over this action, but acknowledge that the Court's review of our RCFC 12(b)(1) motion should focus on whether EIP meets the requirements of 28 U.S.C. § 1491(b)(1), rather than the declaratory judgment provisions of 28 U.S.C. § 1491(b)(2).

s/Geoffrey M. Long
GEOFFREY M. LONG
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Telephone: (202) 307-0159
Fax: (202) 309-0972
E-Mail: Geoffrey.M.Long@usdoj.gov

December 30, 2016

Attorneys for Defendant

STATUTORY ADDENDUM

**33 U.S.C. § 2283 (2016)– Fish and wildlife mitigation**

. . .

**(d) Mitigation plans as part of project proposals**

**(1) In general**

After November 17, 1986, the Secretary shall not submit any proposal for the authorization of any water resources project to Congress in any report, and shall not select a project alternative in any report, unless such report contains (A) a recommendation with a specific plan to mitigate for damages to ecological resources, including terrestrial and aquatic resources, and fish and wildlife losses created by such project, or (B) a determination by the Secretary that such project will have negligible adverse impact on ecological resources and fish and wildlife without the implementation of mitigation measures. Specific mitigation plans shall ensure that impacts to bottomland hardwood forests are mitigated in-kind, and other habitat types are mitigated to not less than in-kind conditions, to the extent possible. If the Secretary determines that mitigation to in-kind conditions is not possible, the Secretary shall identify in the report the basis for that determination and the mitigation measures that will be implemented to meet the requirements of this section and the goals of section 2317(a)(1) of this title. In carrying out this subsection, the Secretary shall consult with appropriate Federal and non-Federal agencies.

**(2) Selection and design of mitigation projects**

The Secretary shall select and design mitigation projects using a watershed approach to reflect contemporary understanding of the science of mitigating the adverse environmental impacts of water resources projects.

**(3) Mitigation requirements**

**(A) In general**

To mitigate losses to flood damage reduction capabilities and fish and wildlife resulting from a water resources project, the Secretary shall ensure that the mitigation plan for each water resources project complies with, at a minimum, the mitigation standards and policies established pursuant to the regulatory programs administered by the Secretary.

**(B) Inclusions**
A specific mitigation plan for a water resources project under paragraph (1) shall include, at a minimum--

**(i)** a plan for monitoring the implementation and ecological success of each mitigation measure, including the cost and duration of any monitoring, and, to the extent practicable, a designation of the entities that will be responsible for the monitoring;

**(ii)** the criteria for ecological success by which the mitigation will be evaluated and determined to be successful based on replacement of lost functions and values of the habitat, including hydrologic and vegetative characteristics;

**(iii)** for projects where mitigation will be carried out by the Secretary--

**(I)** a description of the land and interest in land to be acquired for the mitigation plan;

**(II)** the basis for a determination that the land and interests are available for acquisition; and

**(III)** a determination that the proposed interest sought does not exceed the minimum interest in land necessary to meet the mitigation requirements for the project;

**(iv)** for projects where mitigation will be carried out through a third party mitigation arrangement in accordance with subsection (i)--

**(I)** a description of the third party mitigation instrument to be used; and

**(II)** the basis for a determination that the mitigation instrument can meet the mitigation requirements for the project;

**(v)** a description of--

**(I)** the types and amount of restoration activities to be conducted;

**(II)** the physical action to be undertaken to achieve the mitigation objectives within the watershed in which such losses occur and, in any case in which the mitigation will occur outside the watershed, a detailed explanation for undertaking the mitigation outside the watershed; and

**(III)** the functions and values that will result from the mitigation plan; and

**(vi)** a contingency plan for taking corrective actions in cases in which monitoring demonstrates that mitigation measures are not achieving ecological success in accordance with criteria under clause (ii).

. . .