# In the United States Court of Federal Claims

No. 16-1549C
(Filed: January 25, 2017)
(Re-filed: February 3, 2017)[1]

* * * * * * * * * * * * * * * * * * * *

ECOSYSTEM INVESTMENT PARTNERS,

    *Plaintiff*,

v.

THE UNITED STATES,

    *Defendant,*

and

CROSBY DREDGING, LLC,

    *Defendant-Intervenor*.

* * * * * * * * * * * * * * * * * * * *

Bid protest; Standing; Waiver; 28 U.S.C. § 1491(b)(1); Interested Party; Prospective Bidder.

*Thomas L. McGovern*, Washington, DC, with whom were *Brendan M. Lill* and *Katherine L. Morga*, for plaintiff.

*Geoffrey M. Long*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Martin F. Hockey, Jr.*, Assistant Director, for defendant.

*John F. Emmett*, New Orleans, LA, for intervenor.

---

[1] This opinion was originally issued under seal pursuant to the protective order entered in this case. The parties conferred and did not propose any redactions of protected information.

OPINION

Plaintiff, Ecosystem Investment Partners ("EIP"), protests the United States Army Corps of Engineers' (the "Corps") award of a contract to intervenor, Crosby Dredging, LLC ("Crosby Dredging"), for the provision of dredging and construction services as part of a compensatory environmental mitigation plan to offset other work the Corps was doing to safeguard against possible future storm damage. EIP was not a bidder in connection with this dredging solicitation, but it operated an environmental mitigation credit bank, which it argues should have been selected as part of an earlier environmental administrative action to accomplish the necessary mitigation effects. In other words, plaintiff has no critique to offer of the current dredge and fill solicitation other than its argument that the solicitation would have been unnecessary if the Corps had correctly assessed its environmental options earlier. The case raises the novel question of whether a challenge to the Corps' actions in connection with developing a plan to mitigate its own environmental impacts can be heard as a bid protest.

On December 9, 2016, defendant moved to dismiss the complaint for lack of subject-matter jurisdiction or, in the alternative, to dismiss the complaint in part for failure to state a claim.[2] Oral argument was held on January 5, 2017. As we announced at the conclusion of oral argument, we find that plaintiff was not an "interested party" within the meaning of 28 U.S.C. § 1491(b)(1) (2012), and, in any event, waived its right to challenge the terms of the solicitation by not filing a protest prior to bid opening. In addition, we conclude that plaintiff's real dispute here does not raise a matter "in connection with a procurement or a proposed procurement" and thus we lack subject-matter jurisdiction for a third reason. We therefore grant defendant's motion to dismiss for lack of subject-matter jurisdiction.

BACKGROUND

In response to the damage caused by Hurricanes Katrina and Rita in 2005, the Corps set out to build a flood risk reduction system surrounding the New Orleans metropolitan area known as the Hurricane and Storm Damage Risk Reduction System ("HSDRRS"). During construction of the $14.5 billion project, various wetland habitats, including wildlife refuges in the area,

---

[2]Intervenor joined defendant's motion without separately filing any briefing.

were damaged.  The Clean Water Act ("CWA") and the Water Resources Development Act of 1986 ("WRDA"), as amended, require that the Corps, as would any private party, act to mitigate such damage by implementing a plan to offset environmental impacts.  Specifically, the Corps is required to ensure that impacts to a particular habitat are mitigated through measures to preserve that same type of habitat.

Required habitat mitigation can be accomplished through different means, including mitigation banking (buying credits from an authorized "bank"), contracting with an "in-lieu" fee provider (explained below), or through a Corps-constructed restoration project.  In the case of mitigation banking, the credit provider places a permanent encumbrance on its land in exchange for a certain amount of credits, which it can then sell to private developers, or, in this case, to the Corps itself.  A second option, not relevant in this case, is the use of in-lieu fee providers, where the credit provider is given provisional credits that it can market.  Once it completes a transaction, the in-lieu fee provider then has the responsibility of securing land and placing a conservation easement on that land. *See generally Pioneer Reserve, LLC v. United States*, 128 Fed. Cl. 483 (2016).  A third option for the Corps here was that it could design and implement its own restoration project.  The mitigation plan adopted by the Corps in this case included both the purchase of mitigation credits and Corps-constructed restoration projects.

One factor limiting the Corps' options was a policy of the United States Fish and Wildlife Service to the effect that, when the impacts occur on national wildlife refuge property, mitigation also must take place on refuge property. *See* Final Policy on the National Wildlife Refuge System and Compensatory Mitigation under the Section 10/404 Program, 64 Fed. Reg. 49229 (September 10, 1999).  As a practical matter, this policy had the effect of removing the option of purchasing private mitigation banking credits in order to mitigate for environmental impacts occurring on national wildlife refuge property.

The Corps' initial proposed mitigation plan was described and evaluated in Programmatic Individual Environmental Report #36 ("PIER #36"), which was prepared in accordance with the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h (2012).  PIER #36's stated purpose was to compensate for habitat losses caused by the construction of HSDRRS. It addressed six types of habitats: swamp, bottomland hardwood ("BLH")-dry, BLH-wet, fresh marsh, intermediate marsh, and brackish marsh.  PIER #36 proposed to meet nearly 40% of its total mitigation needs through the purchase

of mitigation credits for the swamp and BLH wet/dry habitat impacts. In relevant part, the plan also proposed that the Bayou Sauvage Marsh Restoration project would provide all the necessary mitigation for both on- and off-refuge brackish marsh impacts. This plan meant that EIP would not be able to sell the brackish marsh mitigation credits generated by its Chef Menteur Pass Mitigation Bank ("Chef Bank") in connection with the mitigation plan. PIER #36 was released for public review and comment from August 12, 2013 to September 25, 2013. During this time, EIP made a number of comments, including a recommendation that PIER #36 recognize its Chef Bank "as a source of brackish marsh mitigation available for HSDRRS use either as the preferred alternative (subject to credit availability and price at time of solicitation) or at least as a source of alternative mitigation if the corps-constructed alternatives prove to be unfeasible or overly expenses." AR 1509.

On October 20, 2015, the Corps issued the Individual Environmental Report Prepared to Supplement: Programmatic Individual Environmental Report (PIER) 36 Bayou Sauvage, Turtle Bayou & New Zydeco Ridge Restoration Project Saint Tammany & Orleans Parishes, Louisiana PIER 36, Supplement 1 ("SIER 1"). SIER 1 explained that, due to increased cost estimates, the Bayou Sauvage Marsh Restoration project was no longer considered feasible. The Corps decided to move the location of these restoration features within the same area in order to lower the cost of the project. SIER 1 stated that "[t]his relocation brought the cost of the project back down such that the exploration of other options to mitigate the requirement was unnecessary." AR 1924.

The new Bayou Sauvage Floodside Brackish Marsh project, however, only met roughly 81% of the Corps' brackish marsh mitigation needs. The Corps proposed to mitigate for the remaining amount of brackish marsh impacts that the Bayou Sauvage Floodside Brackish Marsh project could not produce, along with brackish marsh impacts incurred in order to provide construction access for several restoration projects on national wildlife refuge properties, by creating approximately 82.3 acres of new brackish marsh as part of the New Zydeco Ridge Restoration project on the Big Branch Marsh National Wildlife Refuge. EIP argues as part of this proceeding that it owned mitigation credits that should have been used to compensate for the off-refuge brackish marsh mitigation needs left unfulfilled by the Bayou Sauvage Floodside Marsh project, rather than those needs being satisfied as part of the New Zydeco Ridge Restoration project. It contends that federal law prioritizes mitigation in a way that favors use of mitigation banks, and that the Corps'

actions violated that law. *See* 33 U.S.C. §2317b (2012); 33 C.F.R. § 332.3(b)(2) (2017). It did not, however, comment on SIER 1 when it was distributed for a 30-day comment period from July 9, 2014 to August 8, 2014.

The Corps issued solicitation No. W912P8-16-B-0027 (the "Solicitation") on May 13, 2016, seeking bids for work to be performed in connection with the New Zydeco Ridge Brackish Marsh Restoration, mentioned above. The solicitation stated the following as its description of work: "The work consists of wetland restoration in existing shallow open water via borrow dredging from a designated borrow pit within Lake Pontchartrain. . . . The work requires retention dike construction, board road placement, and a jack-and-bore effort to provide the dredge disposal pipeline access to the construction site." AR 885. After several amendments to the solicitation, the final bid opening date was set for August 4, 2016. EIP did not submit a bid in response to the solicitation. Crosby Dredging was the lowest bidder of the six bids submitted at the time of the bid opening and was awarded the contract on November 18, 2016.

Throughout the solicitation process for the dredging work, EIP was involved in a number of discussions with the Corps attempting to reopen the question of whether mitigation banking credits should have been used rather than owner-initiated mitigation. It questioned both the scoring methods used to determine the available amount and cost of credits at Chef Bank and the Corps' planned restoration efforts at New Zydeco Ridge. On June 16, 2016, EIP sent a letter to the Corps expressing its concerns. The letter stated that it was "essential that there is a consistent, fair and transparent process for the evaluation of mitigation options." AR 290-91. Finally, on August 3, 2016, EIP sent a letter to the Commander and District Engineer of the New Orleans District, Colonel Michael N. Clancy, seeking "to provide comments for the District's consideration on [SIER 1] and [the solicitation]." AR 293. It did not characterize itself as a protest to the solicitation.

After the bid opening, EIP filed a protest at the Government Accountability Office ("GAO") on August 15, 2016, which GAO dismissed on November 15, 2016, as untimely because EIP had not protested the terms of the solicitation prior to the bid opening on August 4, 2016. Specifically, GAO held that EIP's August 3, 2016 letter was not intended to be an agency-level protest, and that, if it was, it failed to conform with the requirements set out in the solicitation for an agency-level protest. *Ecosystem Investment Partners*, B-413587, at 4 (Comp. Gen. Nov. 15, 2016). Three days after its

protest was dismissed at GAO, EIP filed the present action on November 18, 2016.

DISCUSSION

The Tucker Act, as amended in 1996, provides the Court of Federal Claims with jurisdiction over actions "by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Thus, to establish jurisdiction under this statute, a plaintiff must demonstrate that it is an "interested party." This "imposes more stringent standing requirements than Article III" of the Constitution. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Although the term "interested party" is not defined within the statute, it has been construed to consist of two elements: first, plaintiff must establish that it "is an actual or prospective bidder" and second, that it "possess[es] the requisite direct economic interest." *Id.* (citing *Rex. Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)).

There are three independent reasons we cannot entertain this protest, although, given the unique nature of the protest, it is challenging to frame them in traditional bid protest language. They all relate, however, to the same deficiency: plaintiff's real complaint is with the Corp's administrative action in electing to mitigate the environmental impact of its own construction activities by doing dredge and fill on federally-owned submerged lands rather than by purchasing mitigation credits from plaintiff. Plaintiff could not compete for that construction work, and it did not challenge the earlier, critical decision, namely, how to do mitigation.[3]

I. Plaintiff Is Not An "Interested Party" And Thus Lacks Standing

Defendant argues that the complaint must be dismissed because plaintiff lacks standing. Specifically, defendant asserts that EIP cannot show that it is an "interested party" under 28 U.S.C. § 1491(b)(1) because plaintiff

---

[3]We are not suggesting that the court would have had bid protest jurisdiction if plaintiff had challenged the decision to reject environmental banking credits. Presumably, such an action would have to be brought in a district court.

is neither an actual nor a prospective bidder. Given that EIP did not submit a bid in response to the solicitation, we find that EIP is not an actual bidder. Defendant argues that EIP also failed to establish its status as a prospective bidder by not filing a protest prior to the close of the proposal period on August 4, 2016. Plaintiff, on the other hand, argues that it can qualify as a prospective bidder without having submitted a bid because it was deprived of an opportunity to do so as a result of the Corps' allegedly unlawful conduct. Plaintiff alleges that the Corps' decision to solicit a construction restoration project was improper because it ignored the preference for mitigation banking by not acknowledging its Chef Bank mitigation credits as the preferred source of compensatory mitigation.

EIP is correct in that, under certain circumstances, a plaintiff can have standing to protest a solicitation without being eligible to bid on it. *See CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997) (holding that "where a claim is made that the government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids"). Plaintiff does not fit into this line of argument, however, because it failed to diligently pursue its protest rights. In order for EIP to have standing to challenge the validity of the solicitation, it needed to either submit a bid or protest prior to the bid opening. *See MCI Telecomms. Corp. v. United States*, 878 F.2d 362 (Fed. Cir. 1989) (solicitation must be pending when protested). As discussed in more detail below, we find that the August 3, 2016 letter that EIP's managing partner sent to the Corps was not an agency-level protest. EIP's "opportunity to qualify as either an actual or a prospective bidder end[ed] when the proposal period end[ed]" on August 4, 2016, and it failed to protest the solicitation by this date. *Rex Serv. Corp.*, 448 F.3d 1305, 1308 (Fed. Cir. 2006) (quoting *MCI Telecomms.*, 878 F.2d at 365). Accordingly, we hold that EIP did not timely establish its status as a prospective bidder and thus lacks standing to assert its challenge to the solicitation because it is not an "interested party" within the meaning of §1491(b)(1).

II. Plaintiff Waived Its Right To Challenge The Terms Of The Solicitation

For related reasons, plaintiff waived its claim by failing to file a timely agency-level protest to the terms of the solicitation. Thus, even if we were to find that plaintiff has standing to challenge the solicitation, plaintiff has waived its ability to do so. In *Blue & Gold Fleet, L.P. v. United States*, the

Federal Circuit recognized a waiver rule for bid protests, holding that a party that "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d 1308, 1313 (Fed. Cir. 2007). Here, the Corps' alleged error in not using brackish mitigation credits as part of the mitigation plan was obvious when the solicitation was issued on May 13, 2016. In order to avoid waiver, EIP was thus obligated to protest prior to the "close of the bidding process," which was the date of bid opening on August 4, 2016.

Plaintiff argues that the waiver rule should not work to defeat its claim because it diligently pursued its objections prior to the bid opening date. Specifically, plaintiff asserts that the letter it sent to the Corps on August 3, 2016, served as an agency-level protest and preserved its right to challenge the solicitation in this action. Defendant counters by pointing out that this letter was not filed with the contracting officer, as directed by the solicitation and Federal Acquisition Regulation ("FAR") § 33.103(d)(3), and plaintiff also failed to include certain substance required under FAR § 33.103(d)(2). Moreover, defendant disputes whether EIP even intended the letter to serve as a protest. Defendant points to the first sentence of the letter, which simply states that it was written "to provide comments for the District's consideration" of SIER 1 and the solicitation. AR 293.

We hold that the August 3, 2016 letter was not an agency-level protest and that plaintiff thus waived its objections to the solicitation by not properly asserting them prior to the August 4, 2016 bid opening date. The solicitation, along with the relevant regulations, put EIP on notice as to the requirements of a formal agency-level protest.[4] The letter that EIP now argues was a timely protest was not addressed to the contracting officer as required by FAR § 33.103(d)(3). Rather, the letter was sent to the Commander and District Engineer of the New Orleans District. EIP also failed to obtain the written acknowledgment of receipt of the letter from the contracting officer, which was expressly required in the Solicitation for agency-level protests. AR 893. Nor

---

[4] The solicitation incorporated by full text FAR § 52.233-2, which instructs that any protests, as defined in FAR § 33.101, were to be served on the contracting officer and must seek a written and dated acknowledgment of the contracting officer's receipt. AR 893.

did the letter include the solicitation number, copies of documents relevant to the alleged protest, or an express request for a ruling by the agency—all of which are required under FAR § 33.103(d)(2).

In *Bannum, Inc. v. United States*, the Federal Circuit spoke to the importance of protest formalities, stating that

> [r]equiring that the prescribed formal routes for protest be followed (to avoid waiver) reduces uncertainty about whether the issue is joined and must be resolved, and thereby helps prevent both the wasted and duplicative expenses (of all bidders and the government) and the delayed implementation of the contract that would likely follow from laxer standards of timely presentation of solicitation challenges.

779 F.3d 1376, 1380 (Fed. Cir. 2015) (holding that "mere notice of dissatisfaction or objection is insufficient to preserve" a defective-solicitation challenge). As discussed above, EIP's letter disregarded numerous formal requirements for an agency-level protest. In sum, the letter seems merely to be the latest in a continuing series of communications between EIP and the Corps. Accordingly, we hold that EIP waived its ability to challenge the solicitation.

III. The Compensatory Mitigation Plan Was Not Formulated "In Connection With A Procurement"

Even if there had been a timely protest, there is a more fundamental problem with this suit. The government action complained of, namely, the decision to implement a Corp-constructed project rather than purchase mitigation credits from Chef Bank, was not an act "in connection with a procurement or a proposed procurement" and thus we do not have jurisdiction under 28 U.S.C. § 1491(b)(1).

We recognize that the term "procurement" has been defined broadly, leaving "[t]he operative phrase 'in connection with' . . . very sweeping in scope." *RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). In *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008), the Federal Circuit considered what constitutes a "procurement" for the purposes of § 1491(b)(1). It borrowed the definition that Congress provided in 41 U.S.C. § 403(2) (re-codified at 41 U.S.C. § 111),

9

which relates to the creation of the Office of Federal Procurement Policy. Based on that definition, a procurement thus includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111 (2012).

Plaintiff alleges that the Corps violated federal law by not complying with a regulatory preference for mitigation credits when it adopted the New Zydeco Ridge Restoration project as part of its mitigation plan. Plaintiff considers this to be a "violation of a statute or regulation in connection with a procurement or a proposed procurement" because of the causal link between the decision not to use mitigation credits and the issuance of the solicitation. We disagree.

Plaintiff directs the court to a handful of cases that involve claims that it believes are analogous to its challenge to the process of forming the mitigation plan leading to the solicitation. Unlike the present action, however, in the cases plaintiff cites, the government was either attempting to avoid or otherwise directly violating federal procurement law. For example, in *Distributed Solutions*, the government issued a request for information but then used the responses to determine the scope of services it required so it could then add work to an existing contract. In effect, "the Government initiated a type of procurement competition without actually committing to award a contract to the best offeror, thereby circumventing applicable federal procurement laws." *VFA, Inc. v. United States*, 118 Fed. Cl. 735, 740 (2014) (holding that "[w]hile many courts have cited *Distributed Solutions* for the proposition that Tucker Act bid protest jurisdiction is broad, the holding remains limited by the facts of the case"). Here, the Corps did not seek to avoid a competitive procurement and EIP does not suggest the solicitation at issue otherwise violated federal procurement law.

Plaintiff's reliance on *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570 (2005), is also misplaced. There, the protester successfully challenged the Defense Logistics Agency's decision to perform certain distribution services in-house without first performing a cost comparison, which it alleged "violated numerous sources of law that mandate the procurement of supplies and services from the private sector." *Id*. at 574. Plaintiff argues that, as in *LABAT-Anderson*, it has made "allegations that a Government agency violated applicable laws during the pre-solicitation stage of a procurement." Pl.'s Resp. at 13. As defendant points out, however, unlike EIP's challenge, the allegedly

violated regulations in *LABAT-Anderson* were part of the agency's overall procurement scheme for the services it sought to acquire. Here, at the time the Corps was considering its options, it was subject to a web of environmental policies and regulations that have no necessary connection to the solicitation for the subsequent dredge and fill contract.

The Corps' decision making in connection with how to mitigate the effects of its own hurricane protection project may have lead to a procurement in this case, but it is a distortion of *Ramcor* to suggest that its preliminary environmental decision making was done "in connection with" a procurement. As defendant points out, settling on an appropriate compensatory mitigation plan involves trying to maximize ecological benefits in light of a number of ecological factors which are wholly unrelated to the proper procurement of services by the government. Accordingly, we hold that the alleged violation of a statute with respect to the Corps' decision to adopt the New Zydeco Ridge Restoration project as part of its compensatory mitigation plan was not "in connection with a procurement" pursuant to § 1491(b)(1). The court thus lacks subject-matter jurisdiction over the claim.

## CONCLUSION

For the reasons stated above, we grant defendant's motion to dismiss for lack of jurisdiction. The clerk's office is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
Senior Judge
